893 So.2d 1278 (2004)
Paul G. EVERETT, Appellant,
v.
STATE of Florida, Appellee.
No. SC03-73.
Supreme Court of Florida.
November 24, 2004.
Rehearing Denied January 24, 2005.
*1280 Nancy A. Daniels, Public Defender, and David A. Davis, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Cassandra K. Dolgin, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
We review a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. As explained below, we affirm both.

I. THE FACTS AND PROCEDURAL HISTORY
The evidence at trial showed that during the late afternoon or early evening of November 2, 2001, appellant approached Kelly M. Bailey's home, looking for money and carrying a wooden fish bat or billy club. A stranger to the victim, appellant entered her home uninvited. When Ms. Bailey confronted him, appellant beat her, and as she tried to escape, knocked her down and raped her. He also forcefully twisted her neck, breaking a vertebra, which paralyzed her and caused her to suffocate to death. Before leaving, appellant removed his t-shirt, but he took with him some money from the victim's purse, his fish bat, her credit card, and her sweater. Outside the house, he discarded all but the cash. The victim suffered multiple injuries: a knocked-out tooth; a fractured nose; swollen eyelids; lacerations and bruising of her lips; a lacerated lip through which her teeth protruded; abrasions and carpet burns; a broken neck; and vaginal abrasion evidencing the use of force and consistent with nonconsensual sexual intercourse.
Appellant was indicted on charges of first-degree murder, burglary of a dwelling with a battery, and sexual battery involving serious physical force. Among other evidence at trial, the fish bat was traced to the appellant and his DNA matched the vaginal swabs from the victim on all thirteen genetic markers tested.[1] The jury found appellant guilty as charged.
Following the penalty phase, the jury unanimously recommended that appellant be sentenced to death. The trial court followed the jury's recommendation. It found three aggravating factors: (1) appellant was a convicted felon under a sentence of imprisonment at the time of the murder; (2) he committed the murder while engaged in the commission of a sexual battery or a burglary; and (3) the murder was especially heinous, atrocious, or cruel. The court found the following statutory mitigating factors and accorded them the weight indicated: (1) appellant's age (very little weight); (2) the crime "was committed while under the influence of some type of substance" (little weight);[2] *1281 (3) lack of significant history of prior criminal activity (little weight); (4) family background (very little weight); and (5) drug use (little weight). The court also found nonstatutory mitigating factors, with each given very little weight: (1) appellant's remorse; (2) good conduct in custody; (3) the alternative punishment of life imprisonment without parole; and (4) appellant's confession. After weighing the mitigating and aggravating factors, the court found that each of the aggravators individually outweighed the mitigation and imposed a sentence of death.

II. THE ISSUES PRESENTED
Everett raises five issues on appeal: (1) that the trial court's admission at trial of physical evidence obtained from him and his confession violated his Fifth Amendment right to silence; (2) that the trial court erred in admitting the testimony of the State's DNA expert regarding population frequency; (3) that appellant's death sentence is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (4) that the standard penalty phase jury instructions violate Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); and (5) that use of the "under sentence of imprisonment" aggravator is unconstitutional because there is no evidentiary nexus between the factor and the homicide.
We affirm the judgment and sentence. Because appellant's first issue raises a question of first impression in this Court, we fully discuss our reasoning on that issue. First, however, we address appellant's four other claims.

A.
In his second claim, appellant argues that the trial court erred in admitting the testimony of the State's DNA expert regarding population frequency. In Butler v. State, 842 So.2d 817 (Fla.2003), this Court stated that DNA analysis is a two-step process. First a biochemical analysis determines that two samples are alike, and then statistics are employed to determine the frequency in the population of that profile. Id. at 827. Both require use of scientific methods that meet the Frye test for validity. See Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923). As to the first step, the expert testified, without objection, that appellant's DNA matched the DNA from the rape kit on each of the thirteen markers tested and that all other individuals tested were completely excluded as matches. Regarding the statistical analysis, a qualified expert must demonstrate a "sufficient knowledge of the database grounded in the study of authoritative sources." 842 So.2d at 828 (quoting Murray v. State, 692 So.2d 157, 164 (Fla.1997)). Here, the expert testified to seven years' experience in analytical chemistry, attendance at several courses and conferences on population genetics and statistics, and previous experience testifying as an expert in this area. Further, she employed the product rule in her analysis, and she testified that the National Research Council developed the standards and procedures for the analysis, which was accepted internationally as the methodology for such analysis. In addition, she used the FBI database used by the Florida Department of Law Enforcement (FDLE) for all such analysis. See Butler, 842 So.2d at 828 (stating that Butler's claim of invalidity of product rule "is inaccurate in light of the case law that continues to uphold the validity of the product rule"). Finally, her testimony was specific to segments of the population (e.g., 1 in 15.1 quadrillion of the Caucasian population), and she testified that her results were reviewed twice under FDLE's procedures. Accordingly, the court did not err in finding the expert qualified to testify on population frequency *1282 because her testimony was based on established scientific principles in which she was trained and had experience.

B.
In his third claim, Everett challenges his sentence as unconstitutional under Ring v. Arizona, 536 U.S. at 584, 122 S.Ct. 2428, which requires that, other than the fact of a prior conviction, the jury must find the facts supporting the aggravating factors used to impose the death penalty. In this case, the jury unanimously recommended death, and one of the aggravating factors found was that the murder was committed during the course of a sexual battery or burglary, two crimes of which the jury also found Everett guilty. Accordingly, we reject his claim as we have rejected similar ones. See, e.g., Caballero v. State, 851 So.2d 655, 663-64 (Fla.2003) (denying relief under Ring where one aggravating factor was that the murder was committed during the commission of a burglary and kidnapping, charges on which defendant also was convicted, and the court determined that any one aggravator outweighed all the mitigation).[3] We also have rejected the claim that the jury must unanimously specify each aggravator found. See Owen v. Crosby, 854 So.2d 182, 193 (Fla.2003); Duest v. State, 855 So.2d 33, 48-49 (Fla.2003), cert. denied, 541 U.S. 993, 124 S.Ct. 2023, 158 L.Ed.2d 500 (2004).

C.
Appellant's fourth claim is that the jury instructions violated Caldwell v. Mississippi, 472 U.S. 320, 328-29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), which held that it is "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death sentence rests elsewhere." This claim also fails. We have repeatedly upheld the jury instructions against such claims. Floyd v. State, 808 So.2d 175 (Fla.2002); Sochor v. State, 619 So.2d 285, 291 (Fla.1993) ("Florida's standard jury instructions fully advise the jury of the importance of its role and do not violate Caldwell.").

D.
Finally, Everett's fifth claim is that use of the "under sentence of imprisonment" aggravator is unconstitutional because there is no evidentiary nexus between the factor and the homicide. This issue is not preserved for review and does not constitute fundamental error.

III. THE FIFTH AMENDMENT AND MIRANDA[4]
We now address Everett's first claim, which is one of first impression in this Court. Everett contends that his motion to suppress his confession and the biological samples he provided should have been granted because they were obtained in violation of his rights under the Fifth Amendment. In reviewing a motion to suppress evidence, the trial court's findings of fact are accorded a presumption of correctness. This Court, however, must "review independently mixed questions of law and fact that ultimately determine constitutional rights." Connor v. State, 803 So.2d 598, 607 (Fla.2001), cert. denied, 535 U.S. 1103, 122 S.Ct. 2308, 152 L.Ed.2d *1283 1063 (2002). The pertinent facts are undisputed; thus, we review de novo the constitutional issue raised.[5]

A. The Facts
Within hours of the murder, an Alabama bail bondsman, unaware of the murder but searching for Everett because he was a fugitive, found him in Panama City, Florida, and transferred him to Alabama authorities. On November 14, 2001, roughly two weeks after the murder, two Panama City Beach police officers investigating the case, having traced the wooden fish bat found near the crime scene to Everett, traveled to Alabama. They read Everett his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Everett agreed to talk. During the questioning, however, he abruptly stated, "I wish to have a lawyer present.... I mean I want a lawyer." The officers immediately stopped their questioning.
Several days later, on November 19, the Panama City Beach Police requested an Alabama deputy to ask Everett to provide DNA samples for the Florida murder investigation. Everett consented both verbally and in writing. After the DNA swabs were taken, however, Everett advised the Alabama deputy that he had information for Florida authorities. The officer read Everett his Miranda rights, and Everett began his statement. At that point Sergeant Tilley of the Panama City Beach Police Department arrived to retrieve the DNA samples. On the record, Tilley noted that Everett had previously invoked his right to counsel, but had now contacted him desiring to provide information. Sergeant Tilley also read Everett his Miranda rights before Everett continued. At the conclusion of his statement, Everett said, "I do want to talk to a lawyer, but I did want to let you know to get you in the right direction." Sergeant Tilley immediately stopped the interview. Appellant's November 19 statement was not offered at trial.
Finally, on November 27, Alabama authorities informed Everett that Sergeant Tilley was en route to serve an arrest warrant for the Florida murder. After Sergeant Tilley served the warrant, Everett asked to speak to him. At the outset of the interview, Everett acknowledged that he had previously invoked his right to have counsel present but had now asked to speak to Sergeant Tilley without an attorney present. In the ensuing statement, Everett confessed to the crimes.

B. Miranda and Its Progeny
On two separate occasions after Everett invoked his right to counsel under Miranda, law enforcement officers contacted him. On the first occasion, Everett was asked for his consent to provide DNA samples; on the second, officers served him with an arrest warrant. Everett contends these actions violated his Fifth Amendment rights. The issue presented concerns the Fifth Amendment's privilege against self-incrimination and the procedures established to protect it. Accordingly, we begin by reviewing those principles.
The Fifth Amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Thus, it protects a person accused of a crime from being compelled by the State to provide evidence against himself. See Schmerber v. California, 384 U.S. 757, 761, 86 S.Ct. 1826, 16 *1284 L.Ed.2d 908 (1966). In Miranda, 384 U.S. at 479, 86 S.Ct. 1602, the United States Supreme Court was concerned with the inherent pressures of in-custody interrogation and the importance of the privilege against self-incrimination. The Court established prophylactic procedures intended to protect that right, which included requiring authorities to articulate, before custodial interrogation commences, four warnings now thoroughly ingrained in police procedure: (1) that the individual has the right to remain silent, (2) that anything the person says may be used in court, (3) that the individual has the right to have an attorney present during questioning, and (4) that if the individual cannot afford an attorney, one will be appointed for him before questioning. Id. at 479, 86 S.Ct. 1602.
Once the warnings are given, the procedure is clear:
If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.... Without the right to cut off questioning, the setting of an in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.
Id. at 473-74, 86 S.Ct. 1602 (emphasis added); see also Michigan v. Mosley, 423 U.S. 96, 104 n. 10, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (noting that Miranda "distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and directed that `the interrogation must cease until an attorney is present' only `[i]f the individual states that he wants an attorney'").
Clearly, Miranda requires that once a defendant has invoked the right to counsel during questioning, no further interrogation of that individual in custody is permitted, unless counsel is present. The Court, however, did not require counsel's presence for all further communications; only for interrogations. In Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Court considered what constitutes "interrogation" for these purposes. First, the Court concluded that the character of interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." Id. at 300, 100 S.Ct. 1682. The Court then defined the term as follows:
We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.... A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *1285 should have known were reasonably likely to elicit an incriminating response.

Innis, 446 U.S. at 300-02, 100 S.Ct. 1682 (emphasis added) (footnotes omitted).
A short time later the Supreme Court provided further guidelines regarding the boundaries of custodial interrogation. In Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), law enforcement officers immediately ceased the questioning upon the defendant's invocation of his right to remain silent and to counsel. The next day, however, two different officers went to the jail, and after giving Miranda warnings to the defendant, interrogated him. He then incriminated himself. 451 U.S. at 479, 101 S.Ct. 1880. The Court held the confession was obtained in violation of Edwards's Fifth Amendment rights. Id. at 480, 101 S.Ct. 1880. The Court reiterated "that an accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id. at 484-85, 101 S.Ct. 1880 (emphasis added).

C. Testing the Limits of Interrogation
The question in this case is whether a law enforcement officer's request for a consent to search from, or service of an arrest warrant on, a defendant in custody who has invoked the right to counsel violates the Fifth Amendment.
The Supreme Court has distinguished between the Sixth Amendment right to counsel and the Fifth Amendment right against self-incrimination:
The former arises from the fact that the suspect has been formally charged with a particular crime and thus is facing a state apparatus that has been geared up to prosecute him. The latter is protected by the prophylaxis of having an attorney present to counteract the inherent pressures of custodial interrogation, which arise from the fact of such interrogation and exist regardless of the number of crimes under investigation or whether those crimes have resulted in formal charges.
Arizona v. Roberson, 486 U.S. 675, 685, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). The scope of the right to counsel under Miranda is more limited than under the Sixth Amendment. The invocation of the right to counsel under Miranda does not require the immediate appointment of an attorney because the right extends only to interrogation. Miranda, 384 U.S. at 474, 86 S.Ct. 1602 ("If authorities conclude that they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the person's Fifth Amendment privilege so long as they do not question him during that time."); see also Innis, 446 U.S. at 300 n. 4, 100 S.Ct. 1682 (stating that the definitions of "interrogation" under the Fifth and Sixth Amendments "are not necessarily interchangeable"). In Roberson, where the Court held that once a suspect has invoked the right to counsel under Miranda in one crime, the person cannot be interrogated regarding another crime, the Court stated that even if counsel has not been provided, police "are free to inform the suspect of the facts of the second investigation as long as such communication does not constitute interrogation." 486 U.S. at 687, 108 S.Ct. 2093. The police are not forbidden all contact with a defendant in custody; in fact, the Court expressly exempted from the definition of "interrogation" routine police contact "normally attendant to arrest and custody." Innis, 446 U.S. at 301, 302, 100 S.Ct. 1682 *1286 (stating that "interrogation" extends only to police officers' words or actions they "should have known were reasonably likely to elicit an incriminating response").
Service of an arrest warrant is a routine police procedure. It does not require any response from a suspect; nor can it be reasonably expected to elicit an incriminating response. Thus, this action does not constitute interrogation, and we affirm the trial court's denial of the motion to suppress on this claim.
The officer's request for appellant's consent to provide DNA biological samples was the same search request the officers made of several other individuals whom they had not otherwise been able to eliminate from a list of potential suspects in this sexual battery/murder case. Such a request for the consent to search is not reasonably likely to elicit an incriminating response.
The Supreme Court's cases support such a conclusion. In Schmerber, 384 U.S. at 761, 86 S.Ct. 1826, a police officer ordered a doctor to take a blood sample from the injured Schmerber, whom the officer suspected of driving while intoxicated. The Court rejected the defendant's claim that use of this evidence violated his privilege against self-incrimination under the Fifth Amendment. Acknowledging that the evidence was compelled, the Court cited Justice Holmes's statement in Holt v. United States, 218 U.S. 245, 252-53, 31 S.Ct. 2, 54 L.Ed. 1021 (1910), that the "prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." Schmerber, 384 U.S. at 763, 86 S.Ct. 1826. The Court held "that the [Fifth Amendment] privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature, and that the withdrawal of blood and use of the analysis in question in this case did not involve compulsion to these ends." 384 U.S. at 761, 86 S.Ct. 1826. The right to silence only applied to "testimonial or communicative" acts of a suspect.
This Court, too, has noted that
[t]he constitutional privilege against self-incrimination in history and principle seems to relate to protecting the accused from the process of extracting from his own lips against his will an admission of guilt. In the better-reasoned cases it does not extend to the exclusion of evidence of his body or of his mental condition as evidence when such evidence is relevant and material, even when such evidence is obtained by compulsion.
Parkin v. State, 238 So.2d 817, 820 (Fla.1970).
Accordingly, neither the service of the arrest warrant nor the request that Everett consent to providing physical evidence constitutes a word or action "that the police should know is reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 301, 100 S.Ct. 1682.
We note that most courts that have considered this issue have held similarly. See, e.g., United States v. Shlater, 85 F.3d 1251, 1256 (7th Cir.1996) (holding that a "consent to search is not an interrogation within the meaning of Miranda"); United States v. Hidalgo, 7 F.3d 1566, 1568 (11th Cir.1993) (holding that consent to search obtained after defendant invoked right to remain silent is not a self-incriminating statement because it is neither testimonial nor communicative); United States v. Smith, 3 F.3d 1088, 1098 (7th Cir.1993) ("We have held that a consent to search is *1287 not a self-incriminating statement and, therefore, a request to search does not amount to interrogation. This view comports with the view taken by every court of appeals to have addressed the issue."); United States v. Rodriguez-Garcia, 983 F.2d 1563, 1568 (10th Cir.1993) (stating that a request for consent to search is not custodial interrogation and holding that "consent to search is not the type of incriminating statement which the Fifth Amendment was designed to address"); Cody v. Solem, 755 F.2d 1323, 1330 (8th Cir.1985) (stating that Fifth Amendment right to counsel stems from privilege against self-incrimination and is not an independent right and that consent to search is not an incriminating statement because it is not testimonial, nor is physical evidence obtained pursuant to search); State v. Morato, 619 N.W.2d 655, 662 (S.D.2000) (stating that "[a]n officer's request that a suspect consent to a search, however, is not an interrogation or its functional equivalent" and "Morato's consent to search does not constitute an incriminating statement"); State v. Crannell, 170 Vt. 387, 750 A.2d 1002, 1009 (2000) (concluding that the request for consent to search did not violate defendant's Fifth Amendment rights); contra United States v. Yan, 704 F.Supp. 1207, 1211-12 (S.D.N.Y.1989) (holding that a request for search constitutes an interrogation); State v. Britain, 156 Ariz. 384, 752 P.2d 37, 39 (Ct.App.1988), ("view[ing] a request for consent to search, after the [Fifth Amendment] right to counsel has been invoked, as interrogation and the serving of a search warrant as conduct `reasonably likely to elicit an incriminating response'").

IV. OTHER ISSUES
This Court has the independent duty to review the record in each death penalty case to determine whether competent, substantial evidence supports the murder conviction, even if the issue is not raised on appeal. See Fla. R.App. P. 9.140(i); Davis v. State, 859 So.2d 465, 480 (Fla.2003). Therefore, we have reviewed the evidence in this case and find that it is competent to support the first-degree murder conviction under both the felony murder and premeditation theories charged in the indictment. As to felony murder with a sexual battery or burglary, the evidence showed that Everett's DNA matched the DNA found on the vaginal swabs taken from the victim at all thirteen genetic markers tested and that appellant's DNA profile occurred once in every 15.1 quadrillion Caucasians, once in 1.01 quintillion African-Americans, and once in 11.2 quadrillion Hispanics. Everett admitted that he entered the house without the victim's consent and with the intent to steal. He hit the victim, chased her and knocked her down, and then had nonconsensual, forceful intercourse with her. He admitted that he left his shirt in her home. In the course of committing these crimes, he broke the victim's neck, and she suffocated to death. With regard to the premeditated murder charge, Everett was armed with a wooden club (which later tested positive for blood) when he entered the victim's home. He hit her, chased her down, and brutally beat and sexually assaulted her. He forcefully twisted the victim's neck, breaking it; this could not have occurred from her falling as he grabbed her hair. Everett's DNA matched the vaginal swabs from the victim, and Everett admitted leaving his shirt in the victim's home. Accordingly, competent, substantial evidence supports the verdict.
This Court also has the duty to review the proportionality of a death sentence. Anderson v. State, 841 So.2d 390, 407 (Fla.), cert. denied, 540 U.S. 956, 124 S.Ct. 408, 157 L.Ed.2d 292 (2003). The jury unanimously recommended death, *1288 and the trial court found three aggravating factors: (1) that Everett previously had been convicted of a felony and at the time of the murder was under a sentence of imprisonment; (2) that Everett committed the murder while engaged in the commission of a sexual battery or a burglary; and (3) that the murder was especially heinous, atrocious, or cruel. The latter factor is considered one of the most serious statutory aggravators. See Larkins v. State, 739 So.2d 90, 95 (Fla.1999) (stating that the heinous, atrocious, or cruel, and the cold, calculated, and premeditated factors "are two of the most serious aggravators set out in the statutory sentencing scheme"). The court did find several statutory mitigating factors, including appellant's age, that appellant was under the influence of "some type of substance," his lack of a significant history of prior criminal activity, and his family background and drug use. The court also found nonstatutory mitigation: appellant's remorse, his good conduct in custody, the alternative punishment of life imprisonment, and appellant's confession. The court ascribed little or very little weight, however, to the mitigating circumstances it found. We find that the sentence is proportional in relation to other death sentences that this Court has upheld. See, e.g., Johnston v. State, 841 So.2d 349, 361 (Fla.2002) (finding death sentence proportional where four aggravators were found  (1) previous violent felony convictions; (2) murder committed during commission of sexual battery and kidnapping; (3) murder committed for pecuniary gain; and (4) murder was especially heinous, atrocious, or cruel  and moderate weight was given one statutory mitigator and slight weight ascribed to nonstatutory mitigation); Mansfield v. State, 758 So.2d 636, 642, 647 (Fla.2000) (holding death sentence proportional where two aggravating circumstances were found  murder was especially heinous, atrocious, or cruel and murder was committed in course of sexual battery or attempted sexual battery  and no statutory mitigators were found and five nonstatutory mitigators were accorded some or very little weight); Geralds v. State, 674 So.2d 96, 104 (Fla.1996) (upholding death sentence where two aggravators were found  murder was especially heinous, atrocious, or cruel and committed in course of robbery or burglary  and little weight was ascribed to statutory mitigator and very little weight accorded three nonstatutory mitigators). In light of the substantial aggravating circumstances and the lack of substantial mitigation, the sentence in this case is proportional.

V. CONCLUSION
Based on the foregoing, we affirm Everett's first-degree murder conviction and the sentence of death.
It is so ordered.
PARIENTE, C.J., and WELLS, QUINCE, CANTERO, and BELL, JJ., concur.
PARIENTE, C.J., concurs specially with an opinion.
ANSTEAD and LEWIS, JJ., concur as to the conviction and concur in result only as to the sentence.
PARIENTE, C.J., specially concurring.
I concur in the affirmance of the murder conviction and death penalty, including the rejection of relief under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), based on the unanimous death recommendation and the "murder in the course of a felony" aggravator relying on contemporaneous convictions. However, I disagree with the majority's additional reliance on the "sentence of imprisonment" aggravator as a factor that under Ring *1289 may be found by the judge alone. See Allen v. State, 854 So.2d 1255, 1262 (Fla.2003) (Pariente, J., specially concurring) (concluding that the "sentence of imprisonment" aggravator does not fall within the "prior conviction" exception to Ring and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)).
I likewise concur in the rejection of Everett's claim that the jury instructions in this case violate Caldwell v. Mississippi, 472 U.S. 320, 328-29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), based on our longstanding precedent. However, as I have previously stated, I would amend the standard instructions to inform the jurors that they are the finders of fact as to the aggravating circumstances necessary for the imposition of the death sentence. See Globe v. State, 877 So.2d 663, 679-80 (Fla.2004) (Pariente, J., specially concurring); Bottoson v. Moore, 833 So.2d 693, 723 (Fla.) (Pariente, J., concurring in result only), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002). I would apply this change to the instructions prospectively.
NOTES
[1] The DNA expert also testified that the frequency occurrence of appellant's genetic profile is one in 15.1 quadrillion of the Caucasian population, 1.01 quintillion of the African-American population, and 11.2 quadrillion of the Hispanic population.
[2] Based on the clarity and detail of appellant's confession, the court rejected the factor that appellant was under the influence of extreme mental or emotional disturbance; instead, the court found only that appellant was under the influence of a substance.
[3] Further, another aggravating factor was that appellant was under a sentence of imprisonment at the time he committed the murder. This Court has held that this aggravating factor may be found by the judge alone. Allen v. State, 854 So.2d 1255, 1261 (Fla.2003).
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] This issue is preserved for review. The record clearly shows that appellant objected at trial to admission of both his confession and the biological samples on the same grounds raised in the motion to suppress.