# SIXTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Case No. 6D23-1448
Lower Tribunal No. 2021-CT-000090-E

_____

STATE OF FLORIDA,

Appellant,

v.

BRYAN ALLEN REPPLE,

Appellee.

_____

Appeal from the County Court for Orange County.
Eric H. DuBois, Judge.

June 14, 2024

NARDELLA, J.

The State appeals an order granting Bryan Allen Repple's ("Defendant") motion to suppress his breath test results.[1]  Abiding by the long-standing rule that an appellant has the burden of demonstrating error on appeal and finding that the State has not met this burden, we affirm the trial court's order.

---

[1] This case was transferred from the Fifth District Court of Appeal to this Court on January 1, 2023.

## I.

At approximately 2:00 a.m. on a Saturday morning, Officer Andrew Moore of the Maitland Police Department pulled Defendant over for speeding. The traffic offense and subsequent stop occurred inside Maitland's city limits, which lie within Orange County, Florida. While speaking with Defendant, Officer Moore smelled the odor of alcohol, heard Defendant slur his speech, and saw Defendant's eyes were glassy and bloodshot. Based on these observations, fellow Maitland police officer Frank Banos began a driving under the influence ("DUI") investigation. With Defendant's consent, Officer Banos performed three field sobriety exercises, during which Defendant exhibited further signs of impairment. As a result, Officer Banos arrested Defendant for DUI.

Following the arrest, Officer Banos transported Defendant out of Maitland's city limits to a breath test facility in Orange County. The Orange County Sheriff's Office operates the facility, which was staffed that day by a single civilian technician. Once at the facility, Officer Banos accompanied Defendant and the technician into the testing room. There, Officer Banos read Defendant the implied consent warning in accordance with section 316.1932, Florida Statutes (2021).[2]

---

[2] The warning given by the law enforcement officer must inform the individual of the following information:

> The person shall be told that his or her failure to submit to any lawful test of his or her breath will result in the suspension of the person's

After reading the warning, Officer Banos asked Defendant if he consented to the breath test. Defendant did. The test yielded a breath alcohol content exceeding the legal limit, leading the State to charge Defendant with DUI.

Before trial, Defendant moved to suppress the breath test results, arguing that Officer Banos unlawfully asserted his official authority because he acted outside of his territorial jurisdiction to obtain evidence not available to a private citizen using his or her own senses. After an evidentiary hearing, the trial court agreed with Defendant and suppressed the breath test results. The State timely appealed this ruling and raises a single argument for this Court's consideration.

The State's sole argument on appeal is that a municipal officer may, outside his or her territorial jurisdiction, assert official authority to gather evidence not otherwise obtainable by a private citizen when the subject matter of the investigation

---

privilege to operate a motor vehicle for a period of 1 year for a first refusal, or for a period of 18 months if the driving privilege of such person has been previously suspended or if he or she has previously been fined under s. 327.35215 as a result of a refusal to submit to a test or tests required under this chapter or chapter 327, and shall also be told that if he or she refuses to submit to a lawful test of his or her breath and his or her driving privilege has been previously suspended or if he or she has previously been fined under s. 327.35215 for a prior refusal to submit to a lawful test of his or her breath, urine, or blood as required under this chapter or chapter 327, he or she commits a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083, in addition to any other penalties provided by law.

§ 316.1932(1)(a)1.a., Fla. Stat. (2021).

originated within the officer's territorial jurisdiction. Applying that general premise to the facts of this case, the State contends that because the DUI investigation began in Maitland, a Maitland municipal police officer had the power to use his official authority, outside the city limits of Maitland, to read Defendant the implied consent warning in accordance with section 316.1932 to obtain a breath test. For the following reasons, and after conducting a de novo review[3] of the trial court's suppression ruling, we disagree with both the premise of the State's argument and the reasoning of our sister courts that have recognized such extraterritorial police powers not authorized by the Legislature. Consequently, we find that the State has failed to demonstrate that the trial court erred when it suppressed evidence obtained from a search performed outside the territorial boundaries of the municipal officer's jurisdiction.

II.

When an officer obtains evidence by using the appearance of official power, in a jurisdiction where the officer has no power, the officer is said to act under the "color of office." *See State v. Stouffer*, 248 So. 3d 1165, 1168 (Fla. 4th DCA 2018)

---

[3] When the facts relevant to an order granting a motion to suppress are undisputed, as is the case here, the Court conducts a de novo review of the trial court's suppression ruling. *Everett v. State*, 893 So. 2d 1278, 1282–83 (Fla. 2004); *State v. Torres*, 350 So. 3d 421, 422 (Fla. 5th DCA 2022); *Bauman v. State*, 290 So. 3d 147, 148 (Fla. 2d DCA 2020); *State v. Furr*, 723 So. 2d 842, 844 (Fla. 1st DCA 1998).

(citing *State v. Phoenix*, 428 So. 2d 262, 266 (Fla. 4th DCA 1982) *approved*, 455 So. 2d 1024 (Fla. 1984)). The first known use of this expression comes from a thirteenth century English statute prohibiting King Edward's sheriffs from acting without authority.[4] Steven L. Winter, *The Meaning of "Under Color of Law"*, 91 Mich. L. Rev. 323, 327 (1992). As explained by Professor Steven Winter, at that time, the King's officers and agents would have worn the King's coat of arms, giving their conduct, including acts not sanctioned by the King, "all the trappings and indicia of an official act." *Id*. at 396.

By the nineteenth century, the expression was well-established in American jurisprudence and broadly referred to the illegal or unauthorized actions of government officials, often wearing a uniform or carrying a badge, which allowed their unlawful conduct to have "the guise or appearance of authority." *Id*.; s*ee generally City of Lowell v. Parker*, 51 Mass. (10 Met.) 309, 313–14 (1845) ("He was an officer, had authority to attach goods . . . on a suitable writ, professed to have such process, and thereupon took the plaintiff's goods . . . . He therefore took the goods *colore official*, and though he had no sufficient warrant for taking them, yet

---

[4] The English statute provided "[t]hat no Escheator, Sheriff, nor other Bailiff of the King, by Colour of his Office, without special Warrant, or Commandment, or Authority certain pertaining to his Office, disseise any Man of his Freehold, nor of any Thing belonging to his Freehold." 3 Edw. 1, ch. 24 (1275) (Eng.), *reprinted in* 1 STATUTES AT LARGE 92–93 (Danby Pickering ed., 1762).

he is responsible to third persons, because such taking was a breach of his official duty."); *Marbury v. Madison*, 5 U.S. 137, 170 (1803) ("If one of the heads of departments commits any illegal act, under color of his office, by which an individual sustains an injury, it cannot be pretended that his office alone exempts him from being sued in the ordinary mode of proceeding, and being compelled to obey the judgment of the law."). And that is how the expression was first used in Florida jurisprudence.

We trace the phrase "color of office" in Florida case law to a 1962 opinion issued by the Second District Court of Appeal, *Collins v. State*, 143 So. 2d 700 (Fla. 2d DCA 1962). In that case, two officers with the West Palm Beach Police Department set out to investigate the trafficking of marijuana. *Id*. at 701. They began their investigation by questioning the defendant, Herbert Lee Collins, who was already in their custody. *Id*. Collins implicated another suspect, Doc Bailey, whom the officers met with the next day. *Id*. For reasons unknown, Bailey took the officers to a field outside the city limits where marijuana leaves were lying on the ground. *Id*. at 702. After observing such evidence, the officers returned to their jurisdiction in West Palm Beach, seeking to question Collins further, but learned that Collins was now staying in a motel located outside their jurisdiction. *Id*. at 702–03. Undeterred, the officers traveled to the motel, obtained Collins' room number, and knocked on the door. *Id*. Peeping through the hole, Collins saw the officers who

6

had questioned him the day before and who were "wearing uniforms signifying their office." *Id*. Collins opened the door, and the officers entered the room. *Id*. Once inside, the officers observed a marijuana plant in plain sight, leading them to perform an extensive search that produced more evidence of criminality. *Id*. at 702.

At trial, Collins moved to suppress the evidence seized from his motel room on the basis that the officers were outside of their jurisdiction and had no official authority to enter and search his motel room. *Id*. The trial court denied the motion, finding that the officers were at the motel as private citizens and, therefore, exerted no official authority outside their jurisdiction. *Id*. The trial court then reasoned that a private person could have made a citizen's arrest because a felony was committed in their presence and that officers outside of their territorial jurisdiction retained their rights to act as private persons. *Id*. at 703.

The Second District Court of Appeal disagreed and, in doing so, described the officers' purported use of official power, where the officers had no power, as acting under the color of their office:

> The actions of the police officers, which culminated in the arrest, search and seizure, extended over a period of two days. All of these actions, while in the City of West Palm Beach, were consistent with their duties and under their power and authority as police officers. Their previous interrogations with Collins had been as police officers, and their presence at the door of the motel room, in the uniform signifying their official position as police officers, was a part of their continuing investigation begun as police officers. They were acting under color of their office. We

7

> conclude that Collins admitted them to the motel room by virtue of the force and effect of their official position as police officers. He did not admit them as private citizens. An officer gaining access to private living quarters under color of his office and of the law which he personifies must then have some valid basis in law for the intrusion.

*Id*.

Ultimately, because the officers acted under the color of their office to gain access to evidence, the *Collins* court held that in order to preserve the constitutional rights of American citizens, which had been violated by the officers' use of official power where they had none, the law required that the evidence obtained be suppressed. *Id*. at 702 ("[T]he right of citizens to be secure from illegal search and seizure and to be free from the necessity of giving evidence against themselves as guaranteed by the Fourth and Fifth Amendments of the Federal Constitution and by Section 12 and Section 22 of the Declaration of Rights of the Florida Constitution, F.S.A. is inalienable and must be protected at the risk that an individual criminal may go without punishment."). In sum, the *Collins* court used the phrase "color of office" to describe an officer obtaining evidence with the appearance of official power but in a jurisdiction where the officer had no power, and the court provided a remedy for that abuse: suppression of the evidence seized. Since *Collins*, courts throughout Florida have recognized that when an officer improperly acts under the "color of office" to obtain evidence not otherwise available to a private citizen, that

evidence must be suppressed. *Knight v. State*, 154 So. 3d 1157, 1160 (Fla. 1st DCA 2014) (citing *Phoenix*, 428 So. 2d at 266).

III.

Officer Banos asserted his official power as a police officer when he requested the breath test and gave Defendant the implied consent warning in accordance with section 316.1932. *See* § 316.1932(1)(a)1.a., Fla. Stat. ("The chemical or physical breath test must be incidental to a lawful arrest and administered *at the request of a law enforcement officer who has reasonable cause to believe such person was driving or was in actual physical control* of the motor vehicle within this state *while under the influence of alcoholic beverages*." (emphasis added)). What is left to be determined, is whether Officer Banos had the authority to do so outside of his jurisdiction. To determine whether Officer Banos possessed authority, we must answer two fundamental questions not often addressed in our state's jurisprudence: From where does a municipality's power to police come and what is the scope and limit of that power? The answer lies in our state's constitution.

Our state's constitution gives the Florida Legislature the power to establish municipalities, bestow powers upon them, and amend their charters. Art. VIII, § 2(a), Fla. Const.; s*ee also Brooks v. Watchtower Bible & Tract Soc. of Fla., Inc.*, 706 So. 2d 85, 87 (Fla. 4th DCA 1998) (citing Ch. 165, Fla. Stat. (1997); *Town of Palm Beach v. City of West Palm Beach*, 55 So. 2d 566, 572 (Fla. 1951)). In 1959, the

9

Legislature created the City of Maitland through a special act, Chapter 59-1475, Laws of Florida, which, after setting forth the new city's territorial boundaries, proceeded to bestow powers and privileges within those boundaries. Among the many powers granted to the City of Maitland was the power "[t]o exercise full police powers, and establish and maintain a department of police." Ch. 59-1475, § 34(15), Laws of Fla. The Legislature gave this power "for the preservation and enforcement of law and order within said City." Ch. 59-1475, § 50, Laws of Fla. Nowhere in the special act, however, did the Legislature give the City of Maitland the power to police outside of its territorial limits, which our state's constitution vests the Legislature with the power to do, if desired.

Article VIII, section 2(c) of Florida's constitution requires that the exercise of extraterritorial powers by municipalities must be provided for by general or special law. *See* § 166.021(3)(a), (4), Fla. Stat. (2021) (reiterating that Florida's Constitution leaves the Legislature power to enact laws concerning the exercise of extraterritorial power); Op. Att'y Gen. Fla. 82–01 (1982) (concluding that absent statutory authority a municipality possessed no extraterritorial power to operate and maintain or contract for operation and maintenance of private utility system owned by private nonprofit corporation for the use and benefit of persons and properties located outside its corporate limits and to utilize municipal personnel to carry out such operational functions and services). In fact, the Legislature has granted

10

municipalities, including the City of Maitland, the power to exercise police powers outside of its jurisdiction by general law in at least two instances cited by the State.

The first instance, which does not apply here, is fresh pursuit, pursuant to section 901.25, Florida Statutes (2004). This section grants duly authorized municipal police officers the power to arrest a person outside of their jurisdiction when in fresh pursuit, which the Legislature defined in a noteworthy way. Ch. 78-246, § 1, Laws of Fla. After adopting the common law definition of fresh pursuit, which allowed "an officer [to] pursue a felon or a suspected felon, with or without a warrant, into another jurisdiction and arrest him there," *Porter v. State*, 765 So. 2d 76, 78 (Fla. 4th DCA 2000), the Legislature expanded the adopted definition to include the pursuit of a person who violated a municipal ordinance. Ch. 83-119, § 2, Laws of Fla. While the expanded definition is of no consequence in this case, it serves to confirm the well-established concept that a municipal police officer's powers have territorial bounds which the Legislature, and only the Legislature, can expand to address the needs of the State or municipalities.

The second instance, which also does not apply here, is by agreement between local law enforcement agencies; specifically, a written,[5] executed, and filed

---

[5] When the Governor declares a state of emergency pursuant to Chapter 252, participating agencies may waive for up to 90 days from the declared disaster or emergency the written requirements for operational assistance agreements. § 23.1225(5), Fla. Stat. (2013).

agreement under the Florida Mutual Aid Act ("FMAA"), section 23.1225, Florida Statutes (2013). A mutual aid agreement is an agreement between two or more law enforcement agencies, that, among other things, permits voluntary cooperation and assistance in routine law enforcement matters across jurisdictional lines. *Id*. Examples of such cooperation discussed in the FMAA itself include agreements authorizing state university police officers to enforce laws within a specified jurisdictional area and agreements establishing a joint city-county traffic enforcement task force. *Id*.; s*ee State v. Allen*, 790 So. 2d 1122, 1124 (Fla. 2d DCA 2001) (explaining that statutory examples of cooperation are not meant to be exclusive). It is possible an agreement entered into under the FMAA may authorize Maitland police officers to exercise authority outside of Maitland. However, the State did not introduce such an agreement into evidence, a fact the trial court aptly observed at the suppression hearing. Thus, we do not consider whether such an agreement exists. *Cf. Daniel v. State*, 20 So. 3d 1008, 1012 (Fla. 4th DCA 2009) (upholding a trial court's decision to deny a motion to suppress evidence obtained by officer using his official authority in other jurisdiction where his actions were authorized under a mutual aid agreement that provided "[o]n duty officers from one jurisdiction may conduct investigations (that originate in their jurisdiction)").

Having determined that the only two laws the State cited as granting municipalities extraterritorial police powers do not apply, we turn to the premise of

the State's argument—that courts can grant extraterritorial police power to municipalities. We must reject this premise.

Again, article VIII, section 2(c) of Florida's Constitution provides that the "exercise of extra-territorial powers by municipalities shall be as provided by general or special law." Thus, the power to grant municipalities extraterritorial powers belongs exclusively to the Legislature. *See generally Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) (explaining that in a government with a tripartite structure, the power of the judiciary should not intrude upon the powers given to the other branches). While it is possible that the Legislature has granted such power in this case, the State has not pointed to any such law. Further, while it is possible that a mutual aid agreement may provide the City of Maitland with such power, the State did not place any such agreement in the record. Accordingly, based on the record and arguments before us, we find that the municipal officer in this case was without the power to use his official authority outside the city limits of Maitland to obtain evidence not available to a private citizen.

## A.

In finding that Officer Banos was without power, we are in direct conflict with the Fifth District Court of Appeal, which, in *State v. Torres*, 350 So. 3d 421 (Fla. 5th DCA 2022), recognized a court-created exception to the color of office doctrine. In *Torres*, the Fifth District found that a municipal officer who began a DUI

investigation inside his municipality *retained* power outside of his municipality to request that a driver submit to a breath test. Before discussing the *Torres* decision, and our reason for not joining the Fifth District, we must clarify some confusion in the case law describing legislative expansions to a municipal officer's power as so-called "exceptions" to the color of office doctrine.

Crucial to the *Collins* decision was the finding that the officers projected power they did not actually possess to gain entrance to Collins' motel room, which the *Collins* court described as acting under the color of their office. In the decades since *Collins*, some of our sister courts began endorsing judicially created "exceptions" to the color of office doctrine, often as a precursor to discussing instances of fresh pursuit or cooperation under a mutual aid agreement, which are appropriate legislative creations. The State now borrows this language and describes such legislative grants of power as "exceptions" to the color of office doctrine and uses that language to build its argument for recognizing another judicially created exception. As demonstrated below, this phraseology makes little sense when the color of office doctrine is viewed in the correct light. Further, using such language leads to the impression that courts are simply creating another exception to a court-created doctrine.

The two purported "exceptions" to the color of office doctrine routinely discussed in Florida cases are the "fresh pursuit" and the mutual aid agreement

14

exceptions. *See, e.g.*, *Phoenix*, 428 So. 2d at 265; *Daniel*, 20 So. 3d at 1012. While both are exceptions to the general rule that a municipal officer does not have power outside his or her municipality, neither are exceptions to the color of office doctrine. This is because the color of office doctrine is an expression of the rule that an officer cannot project power he or she does not possess to gain evidence or arrest a suspect when a private citizen would be unable to do so. With respect to both "fresh pursuit" and mutual aid agreements, the so-called "exceptions" to the doctrine are not exceptions at all because the Legislature, pursuant to article VIII, section 2(c) of the Florida Constitution, passed legislation that gives official power to officers to act outside their jurisdiction in those instances. Where officers are provided with the power to act by the Legislature, they are not acting without power and under the color of their office, as were the officers in *Collins*. Instead, the officers are acting with actual legal authority to exercise police power.

B.

With this distinction in mind, we confront the court-created "exception" further developed in *Torres*, which the State asks us to adopt.

As is the case here, in *Torres*, the State appealed an order granting a motion to suppress the results of a breath test because the municipal law enforcement officer was outside of his geographic jurisdiction when he requested that the defendant submit to this testing. *Torres*, 350 So. 3d at 422. In holding that the breath test

15

results should not be suppressed, the Fifth District stated that there were "exceptions" to the color of office doctrine. One exception referenced by footnote was the "fresh pursuit" exception, which the court found not to apply.

But the main "exception" the *Torres* court discussed and relied on to reverse the suppression order was a continuing investigation exception. The *Torres* court explained that this exception allows a municipal officer "to continue to act or investigate outside of his or her geographic jurisdiction if the subject matter of the officer's investigation originates inside their city limits." *Torres*, 350 So. 3d at 424. The *Torres* court, however, did not cite any general or special law to support this exception. Rather, it grounded this exception on a line of cases, all of which referenced the exception, but none of which explicitly created the exception or cited any authority for the exception in statute or the constitution. *Id*. In fact, our reading of these cases leads us to conclude that this exception may have simply slid into Florida jurisprudence through multiple courts' use of imprecise language, which over time was cited by one court and then another, often in decisions that recited the purported exception, but never exclusively relied upon it and certainly never examined its origin.

As evidence of this, we start with the two cases cited by the *Torres* court: *Knight v. State*, 154 So. 3d 1157 (Fla. 1st DCA 2014), and *Nunn v. State*, 121 So. 3d 566 (Fla. 4th DCA 2013). Both cases state that municipal law enforcement officers

16

can exercise their law enforcement powers outside the limits of their municipality if the subject matter of their investigation originated inside their municipality's limits. *Knight*, 154 So. 3d at 1159; *Nunn*, 121 So. 3d at 568. But neither case created that exception and, upon close examination, neither case relied upon it.[6] They simply stated that such an exception existed. In reciting the purported continuing

---

[6] The defendant in *Knight* sought to suppress all evidence seized as a result of a search of his home computer. Although the *Knight* court discussed the continuing investigation exception, it never needed the exception to give power to the officer's actions because the officer never projected power she did not have. This is so for two reasons. First, the *Knight* court had already concluded that none of the officer's initial actions were outside her jurisdiction because the "investigation involved computer files appellant placed in folders that were shared over a peer-to-peer network" that could be "accessed over the Internet by way of appellant's file-sharing program," and, therefore, "appellant cannot argue that this portion of [the officer's] investigation was outside her territorial jurisdiction." *Knight*, 154 So. 3d at 1160. Second, the officer's continued involvement in gathering evidence outside of her jurisdiction was authorized by a mutual aid agreement. *Id*. Therefore, the short discussion in *Knight* of a stand-alone, court-created continuing investigation exception was unnecessary to reach the opinion's outcome.

Likewise, in *Nunn* the officer never used the power of her office outside her jurisdiction, and the defendant never argued she did. Instead, the defendant's argument in *Nunn* was that the officer never had authority to record a telephone call from within her jurisdiction because it was *ultimately* discovered that the crime was outside her jurisdiction. *Nunn*, 121 So. 3d at 567 ("Nunn claims that the officer was not acting within her jurisdiction when she recorded the call because all the acts occurred in Margate."). In denying the motion to suppress, the *Nunn* court held that at the time the controlled call was made, the Coral Springs Police Department had "a good faith belief that the acts occurred in both Margate and Coral Springs." *Id*. at 568. The fact that the officers later learned that the acts of abuse only occurred in Margate, outside their jurisdiction, did not invalidate the authority they had to record a controlled call within their jurisdiction in order to investigate a crime they had reason to believe occurred within their jurisdiction.

investigation exception, which neither *Knight* nor *Nunn* ultimately relied upon, both cases cited as authority for its existence *State v. Price*, 589 So. 2d 1009 (Fla. 4th DCA 1991).[7] But, as an authority for the exception, *Price* suffers from the same infirmity.

*Price* is a two-paragraph opinion. From the brief facts we learn that the Fort Lauderdale police used a confidential informant to arrange a drug deal and then recorded the conversation between the informant and the defendant. *Price*, 589 So. 2d at 1010. When arrangements were finalized for the drug deal to take place outside of Fort Lauderdale, the Fort Lauderdale police handed the investigation over to the Broward County Sheriff's Department. *Id*. As such, the officers in *Price* never exerted police power outside their jurisdiction and therefore never needed a court-created exception to grant them that power. Nevertheless, *Price* states that such an exception exists and cites a single case for that proposition: *Goodman v. State*, 399 So. 2d 1120 (Fla. 4th DCA 1981). *Id*.

*Goodman*, however, did not create the continuing investigation exception, nor did it cite a statute or constitutional provision that bestowed such power upon an officer. Instead, the *Goodman* court applied the continuing investigation exception, as if it was a well-established judicially created exception to the color of office

---

[7] The *Knight* court also cited *State v. Allen*, 790 So. 2d 1122, 1125 (Fla. 2d DCA 2001), and *Wilson v. State*, 403 So. 2d 982, 984 (Fla. 1st DCA 1980).

18

doctrine. *Goodman*, 399 So. 2d at 1121. But a year later, the Fourth District felt compelled to remind readers that this exception was "subject to the proviso . . . that officers who act outside their jurisdiction, but not in fresh pursuit, may investigate and gather evidence only through the use of their own senses and through the voluntary cooperation of citizens." *Phoenix*, 428 So. 2d at 266 n.2. In other words, police officers who act outside of their jurisdiction, and not in fresh pursuit, may not use power belonging only to the police. *Id*. Over time, though, this proviso was lost and the line of cases subject to it went on to serve as the foundation in *Price*, which then served as the foundation in *Nunn*, which then served as the foundation in *Knight*, which then served as the foundation in *Torres*. From this history, we conclude that a stand-alone, continuing investigation exception may have inadvertently slid into Florida's jurisprudence despite the *Phoenix* court's warning.

For this reason, and because we find that the power for a municipality to exercise extraterritorial powers must be provided by the Legislature, we reject a court-created exception and certify conflict with the Fifth District's decision in *Torres*. In so doing, we are mindful of the powerful contrast the *Collins* court drew decades ago when excluding evidence obtained based upon the color of office, explaining that: "Any other rule would undermine 'the right of the people to be secure in their persons, houses, papers and effects,' and would obliterate one of the most fundamental distinctions between our form of government, where officers are

19

under the law, and the police-state where they are the law." *Collins*, 143 So. 2d at 703.

AFFIRMED. CONFLICT CERTIFIED.

WOZNIAK and MIZE, JJ., concur.

Ashley Moody, Attorney General, Tallahassee, and Richard A. Pallas, Jr., Assistant Attorney General, Daytona Beach, for Appellant.

Stuart I. Hyman, of Stuart I. Hyman, P.A., Orlando, for Appellee.

NOT FINAL UNTIL TIME EXPIRES TO FILE MOTION FOR REHEARING
AND DISPOSITION THEREOF IF TIMELY FILED