**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3406-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

FRANCK A. AMANG, a/k/a
FRANK ARMAND AMANG,

    Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

March 31, 2025

APPELLATE DIVISION

Argued January 28, 2025 – Decided March 31, 2025

Before Judges Susswein, Perez Friscia and Bergman.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 23-01-0039.

Edward Crisonino argued the cause for appellant.

Jason Magid, Assistant Prosecutor, argued the cause for respondent (Grace C. MacAulay, Camden County Prosecutor, attorney; Jason Magid, of counsel and on the brief).

The opinion of the court was delivered by

SUSSWEIN, J.A.D.

Defendant Franck Amang appeals his jury trial convictions for aggravated assault, simple assault, endangering the welfare of a child, possession of an assault firearm, and possession of large capacity ammunition magazines. Defendant committed the assault and endangering crimes against his daughters. He contends the trial court erred when instructing the jury on child endangerment and improperly responded to the jury's question regarding a parent's right to use corporal punishment. After reviewing the record in light of the governing legal principles, we reject defendant's contention that the trial court erred in instructing the jury on the child endangerment counts and thus affirm those convictions. However, the trial court did not adequately address the jury's question concerning a parent's authority to use corporal punishment in relation to simple assault, and on that basis, we reverse the simple assault convictions and remand for a new trial on those counts.

With respect to the firearms-related convictions, defendant contends the trial court erred by denying his motion to suppress the assault rifle and large capacity ammunition magazines police found in his house while executing a consent search. Following defendant's arrest, police administered Miranda[1] warnings and defendant asserted his right to confer with an attorney. Police went back to defendant while he was still in custody and asked him to consent

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

to a search of his home. Defendant contends that police did not scrupulously honor his prior request to consult with an attorney, rendering his consent invalid.

Defendant's contention raises a question of first impression under New Jersey law, requiring us to consider the interplay between the right against self-incrimination, the right to privacy in one's home and effects, and the right to the assistance of counsel. In considering the synergy of these distinctly enumerated constitutional rights, we are especially mindful that New Jersey law affords heightened protections with respect to each of them. As we explain, while our Supreme Court views federal constitutional precedent as a "polestar," it has on many occasions charted its own course when interpreting and applying the protections afforded to criminal suspects. See State v. Hemepele, 120 N.J. 182, 196 (1987).

Although some courts in other jurisdictions that have addressed this situation stress that Miranda and Fifth Amendment rules must be kept separate and distinct from Fourth Amendment principles, see Section III, we do not view the various rights accorded to criminal suspects as being kept in separate silos meted out one at a time and in isolation from each other. Instead, we view these rights as threads that form an intricately-woven tapestry—one that comprehensively protects persons who are facing an ongoing criminal

3

investigation, and especially those who find themselves in the inherently coercive environment of police custody. Although each thread may be distinct in its origins and properties, together they form an integrated fabric so that pulling out one thread can cause the tapestry to unravel.

The right to confer with an attorney before deciding whether to waive other constitutional rights is a core strand woven together with those substantive rights. By invoking the right to consult with counsel during the <u>Miranda</u> waiver colloquy, defendant signaled that he did not want to cooperate with police without first conferring with an attorney. He thus "sought refuge in his constitutionally-guaranteed right to deal with [] police only through counsel." <u>State v. Hartley</u>, 103 N.J. 252, 273 (1986). We are unpersuaded that refuge provides sanctuary only from police efforts to secure inculpatory evidence in the form of testimonial admissions, not physical evidence, as some courts outside this jurisdiction have reasoned. Nor are we convinced that when defendant expressed his desire to speak with an attorney, he meant only to protect his legal interests with respect to the former type of evidence. We are skeptical that lay persons in police custody fully understand the legal distinction between testimonial and non-testimonial responses. Saying "yes" to the request to search may not have conveyed an inculpatory factual admission but nonetheless led directly to the seizure of inculpatory evidence.

4

Relatedly, we are not swayed by the argument that a consent search request should be permitted in these circumstances because it is not the functional equivalent of interrogation. A consent search is an investigative tool used by police which, like custodial interrogation, is designed to bring into their possession evidence that can be used in court against the person giving consent. In this instance, the Consent to Search/Seize form (Consent form) presented to defendant expressly warned that "anything uncovered by the search can be used as evidence against me." That homage to one of the <u>Miranda</u> warnings tells us that, for practical purposes, the consent request performs the same evidence-gathering function as an interrogation.

When viewed through the lens of the heightened protections accorded to suspects in custody under the New Jersey Constitution and our common law, we conclude the approach most consistent with our jurisprudential values is to establish a simple rule that provides clear guidance to police: when a person in custody asks to speak with an attorney, police should not thereafter request the arrestee to consent to a search when there has been no break in custody. We thus conclude the detective should not have re-approached defendant while he was still in custody to ask for consent. Doing so rendered the consent presumptively involuntary and therefore subject to suppression.

That conclusion does not end our inquiry, however, because there are exceptions to the general rule that evidence seized following a constitutional violation must be suppressed. In this case, the trial court properly found that the State met its burden of proving the elements of the inevitable discovery exception by clear and convincing evidence. We therefore affirm defendant's weapons convictions.

## I.

We discern the following pertinent facts from the record. At all relevant times, defendant lived with his three daughters, Anne, Beth, and Cathy, born in 2004, 2005, and 2009, respectively.[2] On February 7, 2021, defendant slapped Beth in the face after she used her phone late at night. Defendant then retrieved a belt from his bedroom and hit Beth multiple times on her backside with it. He also dragged Beth down a flight of stairs by her hair, choked her with both hands, hit her in the face with a second belt, and threatened to kill her.

Beth testified that, to stop the attack, she told defendant that Anne uses social media, which was against defendant's rules. Defendant called Anne

---

[2] We use pseudonyms to protect the confidentiality of the victims. R. 1:38-3(d).

downstairs and she denied having a social media account. Defendant then hit both Beth and Anne multiple times with the belt.

Defendant took Anne upstairs to his bedroom and told Beth to go to her own bedroom. Beth then retrieved Cathy's iPad, video-called a friend, and asked her to call the police. Cathy testified that she noticed a red mark on Beth's face. During this time, defendant was making Anne do "military-style" exercises "because according to him, he was a drill sergeant, so he knows how to make people feel pain."

When defendant saw police at the door, he instructed Anne to go to her bedroom and told Beth to hide in the closet. He stated that, "if anybody asks, [Beth] is at her friend's house." After defendant answered the door, Beth eventually exited the closet and met police and defendant outside.

While at defendant's house, Gloucester Township Police Department (GTPD) officers briefly interviewed the three children and determined that one child had visible signs of injuries. GTPD Detective Nicholas Aumendo arrived at the house at about 4:00 a.m. and, after speaking with the officers on scene, obtained defendant's permission to conduct a consent search.

Aumendo later testified "we use[d] a standardized Gloucester Township [C]onsent form. Once we have the [C]onsent form, we try to have a copy so he can read it but we usually read it in its entirety and make sure he

understands it, at which time he'll sign and date it, and we will witness it." After defendant indicated that he understood the rights spelled out in the Consent form, he "advised [officers and Aumendo] that he would show [them] where the one belt was up in his bedroom." The officers recovered two belts as evidence.

Police then brought defendant and the children to the police station to conduct formal interviews. Around 8:00 a.m., defendant was taken into the interview room, where police read him his <u>Miranda</u> rights. Aumendo testified that defendant declined to provide "any statement for further investigation" and wanted "to consult with counsel." Defendant signed the <u>Miranda</u> form, circling "no" to the paragraph that reads, "[n]ow, having been advised of your rights and understanding them, do you desire to waive those rights and answer any questions and give a statement?" Aumendo thereupon "concluded the interview" and escorted defendant back to the patrol room.

Police learned from the children that defendant kept firearms at the house. Around 12:15 p.m., Aumendo approached defendant again. Aumendo advised defendant that the three daughters were going to be placed with defendant's girlfriend and they wanted to collect their belongings from their home. Officers also "wanted to make sure [defendant's] dog had food and water." Aumendo testified, "[w]e told [defendant] we wanted to go back to the

house. . . . He had the only key." Aumendo also told defendant that he knew there were firearms in the house and he "wanted to collect them for safekeeping." Aumendo read from a second consent search form and gave it to defendant. Defendant signed and dated it. He did not re-assert a request to speak with an attorney before doing so.

Police later searched the home, with defendant present, and found "three handguns and two rifles, multiple high-capacity magazines, and hundreds of rounds of ammunition."

On February 9, 2021, the prosecutor applied for a Temporary Extreme Risk Protection Order (TERPO). See N.J.S.A. 2C:58-23. The application included statements the three children gave to police, defendant's alleged history of mental illness, and his alleged history of abusing the children. A Superior Court judge granted the TERPO.

The Final Extreme Risk Protection Order (FERPO) hearing was scheduled for February 19, 2021. However, because defendant had granted police permission to search for weapons and those weapons had already been seized during the execution of the second consent search, the prosecutor did not pursue the FERPO and the final hearing was never convened.

In June 2021, defendant was charged by indictment with two counts of second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(l) (counts one and

eight); six counts of third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2) and N.J.S.A. 2C:12-1(b)(7) (counts two, three, nine, ten, fifteen, and sixteen); three counts of third-degree possession of a weapon for unlawful purposes, N.J.S.A. 2C:39-4(d) (counts four, eleven, and seventeen); three counts of fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (counts five, twelve, and eighteen); two counts of third-degree terroristic threats, N.J.S.A. 2C:12-3(b) (counts six and thirteen); three counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2) (counts seven, fourteen, and nineteen); one count of second-degree unlawful possession of an assault firearm, N.J.S.A. 2C:39-5(f) (count twenty); and four counts of fourth-degree possession of large capacity ammunition magazine, N.J.S.A. 2C:39-3(j) (counts twenty-one, twenty-two, twenty-three, and twenty-four).[3]

Defendant moved to suppress the physical evidence seized during the second consent search.[4] The suppression hearing was convened on October 6, 2021. Aumendo was the only witness who testified. The trial court found him credible.

---

[3] In January 2023, the grand jury returned a superseding indictment, repeating the same charges set forth in the original indictment but altering some dates concerning the alleged assaults and child endangerment.

[4] Defendant does not challenge the admissibility of the belts seized during the initial consent search.

At the conclusion of the hearing, the trial court issued an oral opinion, finding that the second search was "valid and reasonable." With respect to defendant's Miranda-related arguments, the trial court held that, although "the State concedes that [] defendant was in custody[,]" "there is no evidence that he was interrogated" as he was never "questioned about what he had been arrested about, those allegations of child abuse, terroristic threats[,] [] use of the weapons, [or] the two belts." The court continued that, "even if [] defendant's Miranda [r]ights were violated in that he shouldn't have been approached about the second search, . . . that evidence should not be suppressed because of the inevitable discovery doctrine" based on the TERPO. The court thereupon denied defendant's motion.

Defendant was tried over the course of six days in late March 2023. The jury found defendant not guilty on counts one, two, four through six, eight, nine, eleven through fifteen, and seventeen through nineteen. Defendant was found guilty on count three (third-degree aggravated assault) and count seven (endangering the welfare of a child). On counts ten and sixteen, defendant was acquitted on the indicted charge of aggravated assault but convicted of the lesser included offense of simple assault. With respect to the weapons charges, defendant was found guilty on count twenty (possession of an assault

weapon) and counts twenty-one through twenty-four (possession of a large capacity ammunition magazine).

On February 26, 2023, the trial court sentenced defendant to an aggregate prison term of fourteen years, with three-and-one-half years of parole ineligibility. Specifically, the court imposed: for count three, a term of four years; for count seven, a term of seven years; for counts ten and sixteen, two terms of six-months each; for count twenty, a term of six years with a forty-two-month period of parole ineligibility; and for counts twenty-one through twenty-four, four terms of one-year each. The court ordered defendant to serve counts seven, ten, sixteen, and twenty consecutively and the remaining terms concurrently.

On appeal, defendant raises the following contentions for our consideration:

> POINT I
>
> DEFENDANT'S UNAMBIGUOUS AND UNEQUIVOCAL INVOCATION OF HIS RIGHT TO COUNSEL WAS NOT HONORED BECAUSE OFFICERS REQUESTED CONSENT TO SEARCH HIS RESIDENCE [S]HORTLY AFTER INVOCATION OF HIS RIGHT TO COUNSEL AND BEFORE DEFENDANT MET WITH COUNSEL.
>
> POINT II
>
> THE TRIAL COURT SHOULD HAVE INSTRUCTED THE JURY [ON] A PARENT'S

RIGHT TO USE CORPORAL PUNISHMENT IN RESPONSE TO ITS' QUESTION ON SIMPLE ASSAULT.

POINT III

THE TRIAL COURT'S JURY INSTRUCTION ON THE ENDANGERING THE WELFARE OF A MINOR CHARGES WAS INCORRECT.

## II.

## A.

We first address defendant's contention the trial court should have suppressed the evidence seized from his home during the second consent search. We begin by acknowledging the foundational legal principles that govern this appeal. The "standard of review on a motion to suppress is deferential." State v. Nyema, 249 N.J. 509, 526 (2022); accord State v. Sims, 250 N.J. 189, 210 (2022). "[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Ahmad, 246 N.J. 592, 609 (2021) (alteration in original) (quoting State v. Elders, 192 N.J. 224, 243 (2007)); State v. S.S., 229 N.J. 360, 374 (2017). An appellate court "defers to those findings in recognition of the trial court's 'opportunity to hear and see the witnesses and to have the "feel" of

the case, which a reviewing court cannot enjoy.'" Nyema, 249 N.J. at 526 (quoting Elders, 192 N.J. at 244).

In contrast to the deference we owe to a trial court's factual and credibility findings, we review a trial court's legal conclusions de novo. S.S., 229 N.J. at 380. Because issues of law "do not implicate the fact-finding expertise of the trial courts, appellate courts construe the Constitution, statutes, and common law de novo—with fresh eyes—owing no deference to the interpretive conclusions of trial courts, unless persuaded by their reasoning." Ibid. (internal quotation marks omitted) (quoting State v. Morrison, 227 N.J. 295, 308 (2016)); see also Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) (noting that appellate courts are not bound by a trial court's interpretations of the "legal consequences that flow from established facts").

In this case, the essential facts are not disputed. Rather, this appeal hinges on a novel question of constitutional law. We thus view the central issue with "fresh eyes."

B.

Turning to substantive legal principles, we briefly summarize the relevant constitutional rights that are accorded to criminal suspects, beginning with the Fourth Amendment and its state counterpart, Article I, Paragraph 7 of

14                                                          A-3406-22

the New Jersey Constitution. Those provisions "guarantee individuals the right to be free from unreasonable searches and seizures." State v. Carter, 247 N.J. 488, 524 (2021). The New Jersey Supreme Court has emphasized that "[n]o principle is more firmly rooted in our Federal and State Constitutions than the right of the people to be free from unreasonable searches of their homes." State v. Hemenway, 239 N.J. 111, 116 (2019).

Furthermore,"[o]ur constitutional jurisprudence expresses a decided preference that government officials first secure a warrant before conducting a search of a home or a person." State v. Cope, 224 N.J. 530, 545-46 (2016) (quoting State v. Watts, 223 N.J. 503, 513 (2015)). That preference finds expression in the bedrock principle that warrantless seizures are presumptively invalid. See State v. Goldsmith, 251 N.J. 384, 398 (2022). "To justify a warrantless search or seizure, 'the State bears the burden of proving by a preponderance of the evidence that [the] warrantless search or seizure falls within one of the few well-delineated exceptions to the warrant requirement.'" State v. Vanderee, 476 N.J. Super. 214, 230 (App. Div. 2023), certif. denied, 255 N.J. 506 (2023) (alteration in original) (quoting State v. Chisum, 236 N.J. 530, 546 (2019)). A consent search is one such exception. State v. Johnson, 68 N.J. 349, 353-54 (1975); State v. King, 44 N.J. 346, 352 (1965).

As we have already noted, Article I, Paragraph 7 of the New Jersey Constitution sometimes affords defendants greater protections than are afforded under the Fourth Amendment. State v. Scott, 474 N.J. Super. 388, 413 (App. Div. 2023). Our Supreme Court has relied on independent state constitutional grounds to diverge from United States Supreme Court search-and-seizure precedents on numerous occasions. In State v. Caronna, Justice (then Judge) Fasciale emphasized that New Jersey has a "sound tradition and powerful precedent of providing greater protection against unreasonable searches and seizures than those guaranteed by the Fourth Amendment . . . ." 469 N.J. Super. 462, 483 (App. Div. 2021). Notably, New Jersey law imposes stricter rules with respect to consent searches.

It is fundamental that the consent to search be voluntary. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1975). New Jersey law goes further; a consent to search is valid only if the State additionally proves the person giving consent knew they had the right to refuse. Johnson, 68 N.J. at 353-54.

In deciding whether a consent to search was made knowingly and voluntarily, a reviewing court considers the totality of the circumstances. King, 44 N.J. at 352-53. To meet its burden of proof, the State is required to prove voluntariness by "clear and positive testimony." Ibid.; State v. Douglas, 204 N.J. Super. 265, 277 (App. Div. 1985).

16                                                                  A-3406-22

C.

The Fifth Amendment, meanwhile, guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Although there is no explicit counterpart to the Fifth Amendment in the New Jersey Constitution, N.J.S.A. 2A:84A-19 provides in part that "every natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty or a forfeiture of his estate." See also N.J.R.E. 503.

In State v. Vincenty, our Supreme Court noted that New Jersey's "common law privilege against self-incrimination affords greater protection to an individual than that accorded under the federal privilege." 237 N.J. 122, 132 (2019) (quoting In re Grand Jury Proc. of Guarino, 104 N.J. 218, 229 (1986)). The Vincenty Court explained that New Jersey law provides greater protection because the right against self-incrimination is "'one of the most important protections of the criminal law[.]' Accordingly, we maintain 'an unyielding commitment to ensure the proper admissibility of confessions.'" Ibid. (first quoting State v. Presha, 163 N.J. 304, 312 (2000); and then quoting State v. Reed, 133 N.J. 237, 252 (1993)). In State v. Andrews, our Supreme Court added that "New Jersey's common law privilege against self-incrimination 'generally parallels federal constitutional doctrine,' but also

17

'offers broader protection than its federal counterpart under the Fifth Amendment.'" 243 N.J. 447, 483 (2020) (internal citations omitted) (first quoting State v. Chew, 150 N.J. 30, 59 (1997); and then quoting State v. Muhammad, 182 N.J. 551, 568 (2005)).

By way of example, "[a]lthough the United States Supreme Court has held that the [S]tate must prove admissibility of a confession by only a preponderance of the evidence, [the New Jersey Supreme Court] has held that the State must prove admissibility beyond a reasonable doubt." State v. Bey, 112 N.J. 123, 134 (1988) (citations omitted); see also State v. O.D.A.-C., 250 N.J. 408, 420 (2022) (reaffirming that New Jersey law requires the State to prove a valid waiver beyond a reasonable doubt while federal law only requires proof by the much lower preponderance-of-the-evidence standard) (citing Colorado v. Connelly, 479 U.S. 157, 168 (1986)).

Miranda safeguards the right against self-incrimination by requiring that custodial interrogations are prefaced with specific warnings. Those warnings "inform a suspect not only of the basic right against self-incrimination, but of other rights designed to effectuate that basic right." Reed, 133 N.J. at 251. Notably, the familiar Miranda warnings include an advisement that the arrestee

has "the right to consult with an attorney before making any statement or answering any questions."[5]

In <u>Hartley</u>, our Supreme Court explained that <u>Miranda</u> established a "prophylactic" rule. 103 N.J. at 275. Such a rule is not just protective but also preventive. When a suspect invokes the right to counsel under <u>Miranda</u>, custodial interrogation is categorically foreclosed. In <u>Edwards v. Arizona</u>, the United States Supreme Court fortified that principle by announcing another bright-line rule: when an interrogee asks to confer with an attorney, not only must the current interrogation immediately cease, but police thereafter may not reinitiate questioning. 451 U.S. 477, 485 (1981).

The novel issue raised in this appeal is whether the strict prohibition announced in <u>Edwards</u> should be extended to safeguard the Fourth Amendment and its state counterpart, Article I, Paragraph 7 of the New Jersey Constitution. Stated another way, when a suspect in custody invokes the right to counsel during the administration of <u>Miranda</u> warnings or an ensuing interrogation, should police be foreclosed from asking the arrestee to grant consent to search just as they are prohibited from asking the suspect to answer questions or reconsider the request to confer with counsel.

---

[5] We repeat verbatim the pertinent language from the "Waiver of Rights of Suspected or Accused" form (<u>Miranda</u> form) that defendant signed.

A-3406-22

## D.

We next briefly summarize the legal principles defining an arrestee's right to the assistance of counsel before waiving another constitutional right.[6] The right to confer with an attorney is sui generis because it is not an end unto itself; rather, it serves to safeguard and effectuate other rights. The right to confer with counsel guaranteed in <u>Miranda</u> is thus said to be "ancillary" to the right against self-incrimination. See <u>Reed</u>, 133 N.J. at 251, 253. It is universally accepted, for example, that attorneys have the "unique ability to protect the Fifth Amendment rights of a client undergoing custodial interrogation." <u>Reed</u>, 133 N.J. at 262 (quoting <u>Fare v. Michael C.</u>, 442 U.S. 707, 719 (1979)).

---

[6] The right to the assistance of counsel is codified in the Sixth Amendment and its state analog, Article I, Paragraph 10 of the New Jersey Constitution. Both provisions specifically refer to the right of "the accused" to "have the assistance of counsel in his defense." <u>U.S. Const.</u> amend. VI; <u>N.J. Const.</u> art. I, § 10. Our Supreme Court in <u>Reed</u> explained, "[u]nder the law of our State, although the right to counsel is implicated in the exercise of the privilege against self-incrimination in the pre-indictment stage of a criminal prosecution, it is not the [same] right to counsel that is constitutionally guaranteed once a defendant has been indicted." 133 N.J. at 263 (citing <u>State v. Sanchez</u>, 129 N.J. 261, 276-77 (1992)). In <u>Sanchez</u>, the Court held, "[a]s a general rule, after an indictment and before arraignment, prosecutors or their representatives should not initiate a conversation with defendants without the consent of defense counsel." 129 N.J. at 277. We focus in this appeal on the right to counsel accorded to persons who are in police custody but have not yet been indicted.

20

This corollary right holds a special place in both federal and state jurisprudence. In its landmark decision in <u>Edwards</u>, the United States Supreme Court underscored the crucial role that defense attorneys can play in advising interrogees regarding the right against self-incrimination, holding that:

> [A]dditional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked [their] right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that [they] responded to further police-initiated custodial interrogation even if [the accused] has been advised of [their] rights. We further hold that an accused, such as Edwards, having expressed [their] desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to [them], unless the accused . . . initiates further communication, exchanges, or conversations with the police.
>
> [451 U.S. at 484-85.]

In <u>Minnick v. Mississippi</u>, the Court doubled down on the categorical rule announced in <u>Edwards</u>, explaining that "[w]hatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with [their] attorney." 498 U.S. 146, 153 (1990).

21

The procedures for safeguarding the right to the assistance of counsel are even more strict under New Jersey law. For example, while federal law requires an interrogation to cease only upon "unambiguous or unequivocal" invocation, our Supreme Court has adopted a more protective approach, requiring authorities to clarify ambiguous invocations. See State v. Gonzalez, 249 N.J. 612, 629-31 (2022). That principle was reaffirmed in State v. Rivas, where our Supreme Court held that:

> Under our state law privilege against self-incrimination, "a suspect need not be articulate, clear, or explicit in requesting counsel; any indication of a desire for counsel, however ambiguous, will trigger entitlement to counsel." [State v.] Alston, 204 N.J. [614,] 622 [2011] (quoting Reed, 133 N.J. at 253). Thus, if a suspect's "words amount to even an ambiguous request for counsel, the questioning must cease," unless the officer makes additional neutral inquiries that clarify that the suspect desires to waive the presence of counsel. See id. at 624.
>
> [251 N.J. 132, 154 (2022).]

Additionally, in Reed, our Supreme Court parted company with the United States Supreme Court's decision in Moran v. Burbine, 475 U.S. 412 (1986), based on New Jersey's especially vigorous protection of an arrestee's right to confer with counsel. In Moran, the United States Supreme Court held that police have no obligation to advise a defendant that a third party summoned an attorney to advise him and that, in the absence of a request by

22

the defendant himself, the attorney's presence at the police station does not affect the right of the police to interrogate him. Id. at 422. The Moran Court concluded that the officer's failure to inform the defendant that an attorney was available to assist him was irrelevant to the question of whether he knowingly waived his rights. Ibid.

In Reed, the defendant's friend brought an attorney to police headquarters. 133 N.J. at 240. The police refused, before and during the defendant's interrogation, to inform the defendant that the attorney was present and sought to confer with him. Ibid. Our Supreme Court commented that it was "compel[led] [] to look to its own State law to determine the standards that should govern the conduct of law-enforcement officers in undertaking the custodial interrogation of a suspect." Id. at 249. The Court noted that the privilege against self-incrimination "consists of a core right that is both preserved and defined by ancillary rights." Id. at 251. It further explained, "[t]he privilege may be conceived as a 'cluster of rights' that collectively give substance to the right of a person not to incriminate [themselves] under custodial police interrogation." Ibid. The Court added that it "has found those ancillary rights may be given even greater protection under our State law than that accorded the federal right." Id. at 251-52. Applying those principles, the Court held that the failure of the police to inform defendant that an attorney

was present and asking to speak with him violated defendant's State privilege against self-incrimination.  Id. at 268.

A critical question raised in this appeal is whether the guardianship role a defense attorney plays should be limited to safeguarding an arrestee's right against self-incrimination when, as in this instance, other constitutional rights are also at stake, and the arrestee has expressly asked to confer with an attorney before agreeing to cooperate with police.  In Rivas, our Supreme Court stressed that "[t]he right to counsel holds a high preferred place in our constitutional scheme because the presence of counsel is an essential safeguard to the exercise of many other valued rights."  251 N.J. at 136 (emphasis added).  In this appeal, we consider whether the rights embodied in the Fourth Amendment and Article I, Paragraph 7 of the New Jersey Constitution should be counted among those "other valued rights" when, as in this case, a person in custody has asked to confer with counsel and is later asked to cooperate with the police investigation by consenting to a search of his home.

### III.

To help us determine how best to address defendant's suppression arguments, we proceed to survey the precedents around the country that consider when and under what circumstances police may ask a person in

custody for consent to search after the arrestee has asserted their right to confer with an attorney.

## A.

We are aware of no caselaw in New Jersey that is directly on point. The one case in which police asked for consent after the arrestee asserted the right to speak to counsel, State v. Pante, 325 N.J. Super. 336 (App. Div. 1999), is distinguishable from the matter before us because the police conduct in that case was especially egregious, clearly violative of the right against self-incrimination.

In Pante, the defendant was arrested after he called a television studio and claimed to have a large quantity of explosives. 325 N.J. Super. at 341-42. After administering Miranda rights, police asked the defendant what was in the briefcase he had been carrying. Id. at 342. The defendant then asked for an attorney, but police ignored his request and continued the interrogation. Ibid. After requesting a lawyer several times, to no avail, he admitted that there were explosives stored at his home and signed a consent-to-search form. Ibid. Police executed a search and found explosives, firearms, and related evidence. Id. at 343-45.

We reached the "unchallenged" conclusion that "defendant's statement and consent to search were involuntary" since police continued to interrogate

defendant after his request for counsel. Id. at 346. We explained that "[o]nce it has been determined that there has been a failure to honor the previously invoked right, the resultant violation is a constitutional infringement requiring suppression of the defendant's statement." Ibid. Because the police had violated the defendant's right against self-incrimination, the panel had no need to address whether the Fourth Amendment and Article I, Paragraph 7 had been violated as well. Rather, the court considered the seizure of the physical evidence to be a fruit of the Fifth Amendment violation. Specifically, the Pante panel held that the exclusionary rule extends to "the indirect as well as the direct products of the constitutional invasion" and that "[t]angible or physical evidence which derives so immediately from a Fifth Amendment violation is no less the fruit of official illegality than the defendant's coerced statement." 325 N.J. Super. at 346.

We note that after Pante was decided, the United States Supreme Court rejected the notion that physical evidence should be suppressed as the fruit of a violation of the right against self-incrimination. In United States v. Patane, the Court explained:

> [T]he Miranda rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause. The Self-Incrimination Clause, however, is not implicated by the admission into evidence of the physical fruit of a voluntary statement. Accordingly,

there is no justification for extending the <u>Miranda</u> rule to this context.

[542 U.S. 630, 636-37 (2004).]

In the matter before us, we conclude that the consent search was unlawful, but not because the police request violated defendant's right against self-incrimination.   Rather, the consent was unlawful under Article I, Paragraph 7 as protected by the ancillary right to the assistance of counsel once defendant expressed that he wanted to confer with counsel before waiving constitutional rights.   We therefore have no occasion to offer an opinion on whether state law principles might lead us to part company with the United States Supreme Court's rationale in <u>Patane</u>.

### B.

While the result in <u>Pante</u> is consistent with our holding in this case, because the panel focused on the self-incrimination violation, we look to other state and federal jurisdictions for guidance and insight on how to address a consent search request made to an arrestee who had asserted the right to confer with counsel when <u>Miranda</u> warnings were administered.

Among federal courts, the Second, Fifth, and Seventh Circuits, along with the Eastern District of Michigan, have ruled that police may request consent to search after a suspect has requested counsel without violating the Fifth Amendment, reasoning either that the request is not an interrogation,

A-3406-22

granting consent is not incriminating, or both. Flynn v. James, 513 Fed. App'x. 37, 39 (2d Cir. 2013); United States v. Gonzalez-Garcia, 708 F.3d 682, 687-88 (5th Cir. 2013); United States v. McClellan, 165 F.3d 535, 544 (7th Cir. 1999); Marsack v. Howes, 300 F. Supp. 2d 483, 494-97 (E.D. Mich. 2004); cf. Cody v. Solem, 755 F.2d 1323, 1330 (8th Cir. 1985) (concluding that where an indicted defendant consented to a search after being advised against it by his attorney, that consent to search is not an incriminating statement).

Nonetheless, the Fifth and Seventh Circuits consider these circumstances as part of a holistic analysis of whether a defendant consented voluntarily to a search. Gonzalez-Garcia, 708 F.3d at 688; McClellan, 165 F.3d at 545-46. The Eastern District of Pennsylvania likewise applied a totality-of-the-circumstances analysis, choosing not to "wad[e] into unclear legal waters and determin[e] whether an officer's request that a person in custody give consent to a search constitutes an interrogation, whether the circumstances indicate that the consent form was 'compelled' under the Fifth Amendment, and whether a consent form constitutes a testimonial statement." United States v. Smith, 575 F. Supp. 3d 542, 554 (E.D. Pa. 2021). The Federal District Court for the District of Columbia, conversely, has squarely held that police may not request consent to search after an individual has requested constitutionally guaranteed

28

representation. United States v. Flemming, 31 F. Supp. 2d 3, 5-6 (D.D.C. 1998).

Among the states, New York, Arizona, and Oklahoma courts have held that a request for constitutionally guaranteed counsel, absent intervening circumstances, precludes police from requesting a defendant's consent to search. People v. Johnson, 399 N.E.2d 936, 937-38 (N.Y. 1979) (holding that, by requesting consent to search, police did not scrupulously honor defendant's request for counsel); State v. Britain, 752 P.2d 37, 39 (Ariz. Ct. App. 1988) ("We view a request for a consent to search, after the right to counsel has been invoked, as interrogation."); Kreijanovsky v. State, 706 P.2d 541, 545-46 (Okla. Crim. App. 1985) (holding that a request for counsel must stop police from seeking "further consensual admissions," including consent to search); see also State v. Sallard, 451 P.3d 820, 824 (Ariz. Ct. App. 2019) (citing Britain, 752 P.2d at 37); People v. Loomis, 255 A.D.2d 916 (N.Y. App. Div. 1998) (citing Johnson, 399 N.E.2d at 936); Trice v. State, 853 P.2d 203, 211 (Okla. Crim. App. 1993) (citing Kreijanovsky, 706 P.2d at 545).

A Florida intermediate appellate court embraced—albeit in dicta—the proposition that "at the moment" a defendant asked for an attorney, officers should have stopped "all questioning and certainly should not have thereafter extracted an alleged consent" to search defendant's briefcase. Horvitz v. State,

A-3406-22

433 So. 2d 545, 547 (Fla. Dist. Ct. App. 1983). The Florida Supreme Court, however, took a contrary position, holding that, in the context of a request for consent to obtain a DNA sample, a consent to search is not an interrogation and therefore does not implicate Miranda-type protections. Everett v. State, 893 So. 2d 1278, 1285-87 (Fla. 2004).

Nebraska, South Dakota, and Missouri, like the Fifth and Seventh Circuits, consider prior requests to speak with an attorney as part of the multifactor test of voluntariness, rejecting the notion that a request for consent in these circumstances constitutes a constitutional violation. State v. Houser, 490 N.W.2d 168, 175-77 (Neb. 1992); State v. Morato, 619 N.W.2d 655, 662 (S.D. 2000); State v. Williams, 159 S.W.3d 480, 486 (Mo. Ct. App. 2005).

Ohio courts have consistently held that "after a suspect has invoked [their] right to counsel after Miranda warnings, the police are not prohibited from asking a suspect to consent to a search," on the grounds that the request for consent "does not constitute an interrogation." State v. Moore, No. 27973, 2019 WL 856764, at *7 (Ohio Ct. App. 2019) (collecting cases).[7]

---

[7] Moore relies on several unreported cases. Per the Ohio Supreme Court Rules for the Reporting of Opinions, "[a]ll opinions of the courts of appeals issued after May 1, 2002 may be cited as legal authority and weighted as deemed appropriate by the courts without regard to whether the opinion was published or in what form it was published." Ohio Ct. R. 3.4.

The Vermont Supreme Court similarly held that there is no constitutional violation when a consent search is requested after the defendant has asked to confer with counsel because the request is not an interrogation and the consent, if given, is not incriminatory. State v. Crannell, 750 A.2d 1002, 1008-09 (Vt. 2000). The Crannell Court rejected the rationale of a Federal District of Vermont decision in United States v. Taft, 769 F. Supp. 1295 (D. Vt. 1991). Crannell, however, did not address what role, if any, a post-invocation consent request might have in analyzing the voluntariness of the consent.

IV.

We glean from these cases that while other jurisdictions have different approaches analyzing the issue, leading to different outcomes, the prevailing viewpoint is that a request for consent to search made after a suspect has invoked the right to counsel is not itself a federal constitutional violation and does not automatically require suppression of the fruits of the search. Needless to say, however, none of these courts were following New Jersey law, or applying our jurisprudential values, when they came to their several conclusions. We reiterate and stress that the New Jersey Supreme Court has not been reluctant to part company with other courts, including the United

31

States Supreme Court, when it comes to safeguarding the rights of the accused under our state constitution.

In Caronna, we "address[ed] our obligation to apply the heightened constitutional guarantees afforded under the Constitution of New Jersey." 469 N.J. Super. at 481 (emphasis added). We proceeded to identify multiple "separate equally dispositive reasons" for diverging, in that case, from United States Supreme Court precedent that recognizes an exception to the exclusionary rule when police while executing a search warrant violate the "knock and announce" rule. Ibid. We explained that while no state can diminish rights established under the federal Constitution, state law can provide more expansive protection, noting "New Jersey has done just that." Ibid.

That does not mean divergence is automatic or even presumptive. It is true that there are numerous examples of divergence, but that may be misleading because the list has grown incrementally over the span of decades. There are also instances where our Supreme Court conformed state law with federal precedent. In State v. Torres, for example, our Supreme Court recently acknowledged that:

> [O]ur case law has "[g]enerally . . . not afforded greater protection regarding the scope of a search

incident to a lawful arrest under our State Constitution than that provided in Chimel[ v. California[8]]'s interpretation of the Fourth Amendment." We adhere to that general practice in this case, resting our analysis on Fourth Amendment principles without adopting a more expansive approach under our State Constitution in this setting.

[253 N.J. 485, 504 (2023) (quoting State v. Dangerfield, 171 N.J. 446, 461-62 (2002)).]

V.

That leads us to consider whether in the circumstances presented here, we should expand the protections afforded to persons in police custody. In State v. Hunt, Justice Handler offered thoughtful guidance on when the New Jersey Constitution should be interpreted to provide greater protections against unreasonable searches and seizures than the United States Constitution affords. 91 N.J. 338, 358-68 (1982) (Handler, J., concurring). He identified "preexisting state law" and "state traditions" as important factors. Id. at 365-67. Relatedly, in Caronna, we "appl[ied] the search and seizure jurisprudential trail already blazed under the New Jersey Constitution." 469 N.J. Super. at 481.

Our jurisprudence already provides enhanced standards for consent searches, see Johnson, 68 N.J. at 353, and places a greater value on the role an

---

[8] 395 U.S. 752 (1969).

attorney plays when giving advice on whether to waive constitutional rights, see Reed, 133 N.J. at 262. Furthermore, our Supreme Court has never embraced the notion that Fourth and Fifth Amendment rights must be kept separate and distinct. In Andrews, for example, our Supreme Court recently explained, "[o]ur privilege [against self-incrimination] derives from the notion of personal privacy," and that "[i]n contrast to federal law which distinguishes between Fourth and Fifth Amendment inquiries, New Jersey's common law views the privilege against self-incrimination as incorporating privacy considerations." 243 N.J. at 483. See also In re Grand Jury Proc. of Guarino, 104 N.J. at 231 (noting that the right against self-incrimination encompasses an individual's right "to a private enclave where [they] may lead a private life") (quoting Murphy v. Waterfront Comm'n, 378 U.S. 52, 55 (1964)).

Importantly, moreover, we are not asked to invent a new prophylactic rule from scratch. Rather, we consider whether to adapt the well-established rule announced in Edwards to protect a different right than the one it was originally designed to effectuate, in essence, teaching an old rule a new trick.

All that said, before taking the step of adopting a categorical rule, we deem it prudent to consider whether alternative measures might suffice to protect an arrestee's rights under Article I, Paragraph 7. We thus analyze three options: (1) treat the prior request for an attorney as a factor in the totality-of-

34

the-circumstances test used to determine whether consent was given voluntarily; (2) require police when asking for consent to clarify whether a prior request to confer with counsel pertained only to the right against self-incrimination and not to the waiver of other constitutional rights; and (3) treat the prior request to confer with an attorney as a bright-line bar from asking for consent, rendering consent presumptively involuntary.

## VI.

The State contends it is sufficient to consider defendant's request to speak with an attorney as a relevant factor in determining whether the consent was given voluntarily. That approach is consistent with the general principle that courts review the waiver of both Fourth and Fifth Amendment rights by applying a voluntariness test, considering the totality of the circumstances.

In State v. Hagans, our Supreme Court set forth two non-exhaustive lists of circumstances: those that might indicate consent was coerced and, conversely, those that might indicate consent was given voluntarily.[9] 233 N.J. 30, 39 (2018). The former factors include whether a person was already arrested when they gave consent, and whether the defendant was handcuffed while they gave consent. Ibid.

---

[9] The Supreme Court in Hagans listed factors indicating coerced consent which include:

But asking to confer with a lawyer—a circumstance not accounted for in either list set forth in Hagans—is fundamentally different from the factors collected in Hagans because it is not just a relevant circumstance; it is an assertion of a constitutional right. We are not persuaded that the totality-of-the-circumstances analytical framework, standing alone, provides sufficient protection under the heightened standards set forth in New Jersey law, even if we were to consider a request to confer with counsel as a highly significant fact. Cf. Presha, 163 N.J. at 308, 315 (noting that, in a juvenile Miranda case, "courts should consider the absence of a parent or legal guardian from the interrogation area as a highly significant fact when determining whether the

_____

> (1) that consent was made by an individual already arrested; (2) that consent was obtained despite a denial of guilt; (3) that consent was obtained only after the accused had refused initial requests for consent to search; (4) that consent was given where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered; [and] (5) that consent was given while the defendant was handcuffed.
>
> [233 N.J. at 39 (quoting King, 44 N.J. at 352-53).]

Factors indicating voluntariness of consent include: "(1) that consent was given where the accused had reason to believe that the police would find no contraband; (2) that the defendant admitted his guilt before consent; [and] (3) that the defendant affirmatively assisted the police officers." Id. at 39-40 (citing King, 44 N.J. at 353).

State has demonstrated that a juvenile's waiver of rights was knowing, intelligent, and voluntary" and clarifying that "[b]y 'highly significant factor' we mean that courts should give that factor added weight when balancing it against all other factors").

In Reed, our Supreme Court opted for a bright-line rule requiring police to inform an arrestee when a lawyer is present to confer with them in part because the Court was not convinced a totality-of-the-circumstances analysis would be adequate. 133 N.J. at 264-65. After considering opinions in other states that "resort[ed] to a rule that was based on the 'totality of the circumstances,'" ibid., the Court noted, "[w]e rejected the 'totality of the circumstances' approach in Hartley, because it is not feasible to determine defendant's subjective state of mind." Ibid. (citation omitted).

We deem it especially noteworthy that the first time the New Jersey Supreme Court relied on independent state constitutional grounds to diverge from United States Supreme Court precedent, Johnson, 68 N.J. 349, our Supreme Court also focused on the defendant's state of mind, concluding it is not enough for the State to prove that a consent to search was made voluntarily. Parting company with the United States Supreme Court's decision in Schneckloth, 412 U.S. 218, the Johnson Court held that the State must also prove the defendant knew he had the right to refuse consent. 68 N.J. at 353.

37

<u>Johnson</u> thus laid the seeds not only for relying on independent state grounds to augment a suspect's rights, but also for looking beyond traditional voluntariness analysis in determining the validity of a consent search under New Jersey law.

The "knowing" proof requirement is of particular concern here because asking for consent to search after the arrestee has already invoked the right to counsel under <u>Miranda</u> poses the risk of misleading the suspect with respect to the right to confer with an attorney before deciding whether to grant consent to search. Both the <u>Miranda</u> form and Consent form used in this case warned defendant that evidence obtained from the waiver of rights could be used against him.[10] But there are significant differences between the two forms that become apparent when they are used sequentially, that is, when police ask an arrestee to consent to a search after the arrestee received <u>Miranda</u> warnings and invoked the right to speak to an attorney. When juxtaposed against the <u>Miranda</u> form, the absence of any reference in the Consent form to the right to confer with an attorney is both conspicuous and telling.

---

[10] The <u>Miranda</u> form states in relevant part, "[a]nything you say can and will be used against you in court." The Consent form states, "anything uncovered by the search could be used as evidence against me or another party."

We are not suggesting the Consent form or colloquy must be revised to incorporate the fulsome <u>Miranda</u> warnings. The need for more comprehensive warnings safeguarding the right against self-incrimination reflects the fact that suspects may face a potentially protracted interrogation during which police interrogators employ persistent techniques designed to "wear down" the interrogee. <u>See</u> <u>Rivas</u>, 251 N.J. at 155 (quoting <u>Smith v. Illinois</u>, 469 U.S. 91, 98 (1984)). In contrast, granting consent to search is essentially a one-time waiver.[11] Stated another way, a custodial interrogation poses ongoing risks to the right against self-incrimination that warrant special protections in the form of the comprehensive warnings required by <u>Miranda</u> and its progeny.

We also acknowledge that when our Supreme Court in <u>Johnson</u> parted company with federal law by requiring the State to prove the suspect knew he had the right to refuse consent, 68 N.J. at 353, it did not suggest that the State must also prove the suspect knew he had the right to confer with an attorney before deciding whether to waive Article I, Paragraph 7 rights. We are nonetheless concerned that when a consent search request is made after an

---

[11] As noted in the Consent form, the person granting consent has the right to be present during the execution of the search and can revoke consent at any time. <u>See</u> <u>State v. Williams</u>, 461 N.J. Super. 80, 90 (App. Div. 2019); <u>State v. Domicz</u>, 188 N.J. 285, 307 (2006). The point, however, is that unlike an interrogation, the consent request process does not entail an ongoing opportunity for police to overbear the suspect's will.

A-3406-22

arrestee has already invoked the right to speak with an attorney, the requesting officer's failure to mention the right to counsel might imply that there is no right to confer with an attorney before deciding whether to grant a consent search. Although there is no procedure or system in place for appointing counsel to give advice on consent searches at the government's expense, suspects in custody have the right to refuse consent for any reason, including because they wish to consult an attorney before deciding whether it is in their best interests to aid the police in searching for physical evidence.

We have other concerns with relying solely on traditional voluntariness analysis given our state law requirement that waivers be made knowingly. As we noted in Section III, many of the jurisdictions that have addressed this issue rely heavily on the fact that <u>Miranda</u> and <u>Edwards</u> only protect against making testimonial admissions. An arrestee who has affirmatively asserted his right to counsel under <u>Miranda</u>, however, may not grasp the legal distinction between answers to police questions that are "testimonial" and those that are not. After all, granting consent entails answering a police "question," albeit an affirmative answer to that question does not convey a factual admission. It bears noting that the <u>Miranda</u> form read to defendant states an arrestee has "the right to consult with an attorney before making any statement or answering <u>any</u> questions." (Emphasis added). That broad statement does suggest any

40

limitation on the type of questions posed and does not mention much less explain the difference between testimonial and non-testimonial answers.

We add that while the words and actions that grant consent may not be testimonial as that term is understood by lawyers and judges, nor are they "ministerial."  Cf. State v. M.L., 253 N.J. Super. 13, 21 (App. Div. 1991) (noting that a police request for pedigree information is considered "ministerial in nature and beyond the right to remain silent," thus falling outside the scope of Miranda); see also State v. Melendez, 454 N.J. Super. 445, 457-58 (App. Div. 2018).  Indeed, there is nothing ministerial or routine about yielding a constitutional right, especially when, as in this case, the person is subject to the inherent coercion of police custody and the constitutional right being waived pertains to the sanctity of a home.  Here, defendant's consent led directly to the seizure of the evidence the State used against him at trial to prove the possessory crimes for which he was convicted.

Aside from considering the problem from an arrestee's perspective, we are also concerned that if a prior request to speak with an attorney were merely a factor in determining voluntariness, police would not be precluded, or deterred, from reinitiating a substantive conversation with the arrestee to ask for consent.  The Edwards prophylactic rule is designed to preclude any such reinitiation as a means of preventing violations of the Self-Incrimination

41

Clause.  Cf. Reed, 133 N.J. at 259 (stating that "we have stressed, as a matter of state law, that the salutary function of the ancillary rights [referring to the right to consult with an attorney] defining the privilege against self-incrimination is to constrain official conduct") (emphasis added).  Fourth Amendment/Article I, Paragraph 7 rules likewise serve to limit the exercise of police discretion with a view towards preventing unlawful privacy intrusions.

The deterrent function of the exclusionary rule depends on having clear rules for police to follow.  That function is undermined when police cannot figure out what they are permitted and prohibited from doing under our constitutional framework.  See State v. Witt, 223 N.J. 409, 444 (2015) (rejecting the prior exigency test under the Automobile Exception to the warrant requirement as it was "unsound in principle and unworkable in practice[,]" relying on "a dizzying number of factors," and replacing it with a simpler, more predictable test).  We note that it may be especially difficult for police to reliably predict the outcome of voluntariness analysis because a reviewing court may consider facts and circumstances pertaining to the arrestee that police are not even aware of.  See State in Interest of M.P., 476 N.J. Super. 242, 290 (App. Div. 2023); State v. L.H., 239 N.J. 22, 42 (2019) (noting that totality-of-the-circumstances analysis takes into consideration not just the "details of the interrogation" but also the "characteristics of the

A-3406-22

accused") (quoting Dickerson v. United States, 530 U.S. 428, 434 (2000)). Simply put, the totality-of-the-circumstances test leaves some uncertainty as to whether an officer may reinitiate a substantive discussion with an arrestee who has already asked to speak with counsel, imperiling both the rights of the arrestee and the admissibility of evidence found during a consent search.

## VII.

We next consider the second option, that is, to require police when asking for consent to search to clarify whether the arrestee had only wanted to confer with counsel regarding the interrogation and the right against self-incrimination, and not about the ongoing investigation more generally or the right to refuse consent to search. Stated differently, this option would require police to confirm that by asserting the right to counsel under Miranda, defendant did not mean to convey that they only wanted to deal with police through an attorney. See Hartley, 103 N.J. at 273.

Under current consent search waiver procedures, we have no way of knowing for certain whether an arrestee who previously asked to speak with an attorney intended only to invoke the right against self-incrimination and did not mean for the request to apply to the waiver of other rights. It seems logical that if the arrestee had expressly told police they are not prepared to waive any constitutional privilege before conferring with an attorney, police should not

43

be allowed to try to convince the arrestee to change their mind. But absent any such definitive spontaneous statement, how can we know what the arrestee intended?

To address that question, we consider whether police when asking for consent to search should be required to clarify the scope of a prior request to confer with counsel, and if that prior request meant that the arrestee does not want to cooperate with police investigators in any way. At first blush, a clarification requirement seems reasonable, enhancing arrestees' rights by effectuating their intention without resorting to a categorical rule that presumes the arrestee meant to foreclose all forms of cooperation with police.

This approach is consistent with the notion that suspects can impose limitations on the scope of their waiver of constitutional rights, agreeing to

waive rights for some purposes but not others.[12] Cf. State v. Kucinski, 227 N.J. 603, 623 (2017) (holding that while defendant limited the scope of the interrogation to certain topics by stating remarks like "let's not talk about that part," he did not invoke his right to remain silent as to foreclose further questioning, noting, "considered in context, defendant's refusal to answer certain questions was not an attempt to end the dialogue"). Under the clarification option, police would essentially be reminding suspects they had asked to speak with an attorney before answering questions and would now be inquiring of the suspect whether that earlier request carries over to the decision to consent to a search.

This analytical approach also builds on the foundation of New Jersey precedents that permit, indeed require, police to clarify ambiguities with

---

[12] A Fourth Amendment variation of this principle would arise if a person were to grant police permission to search one specified premises or container, but not another place or object that police sought to include within the scope of the consent search. The Consent form here includes blank spaces to specify and describe the vehicle, premises, or "other" property that police are authorized to search. Relatedly, the preprinted form indicates that police are authorized "to conduct a complete search" of the specified places/property, including "[a]ll of its contents," to further clarify the physical scope and boundaries of the consent. Compare State v. Powell, 294 N.J. Super. 557 (App. Div. 1996) (holding that a consent form's language allowed complete search of vehicle, including space behind door panel where drugs were found), with State v. Leslie, 338 N.J. Super. 269 (App. Div. 2001) (holding that the search exceeded the scope of consent because the consent form that the defendant signed made no express reference to the vehicle's trunk).

respect to an arrestee's request to speak with counsel.  See Gonzalez, 249 N.J. at 629-31 (noting that whereas federal law requires interrogation to stop only upon "unambiguous or unequivocal" invocation, see Davis v. United States, 512 U.S. 452, 461-62 (1994), New Jersey has adopted a more protective approach, requiring authorities to clarify ambiguous invocations).

On closer examination, however, the clarification approach raises concerns.  In this case, defendant's prior request to confer with an attorney was neither ambiguous nor equivocal.  The detective clearly understood that defendant invoked his right to counsel during the Miranda waiver protocol, which is why the interrogation immediately ceased.

The clarification obligation developed under New Jersey law is meant to determine whether the suspect had in fact asked to confer with an attorney, not to allow police to probe why the suspect made any such prior request or to reveal what the suspect wanted to discuss with counsel.  Cf. Alston, 204 N.J. at 623-24 (cautioning that officers may not use their obligation to clarify the suspect's request by asking "questions that 'operate to delay, confuse, or burden the suspect in [the] assertion of [their] rights.'") (quoting State v. Johnson, 120 N.J. 263, 283 (1990)).

There is no precedent, moreover, for post-hoc clarification of a suspect's ambiguous references to an attorney.  The New Jersey case law creates a duty

A-3406-22

to <u>contemporaneously</u> clarify an ambiguous assertion before continuing on with the interrogation. See <u>Rivas</u>, 251 N.J. at 154 (holding that "if a suspect's 'words amount to even an ambiguous request for counsel, the questioning must cease,' unless the officer makes additional neutral inquiries that clarify that the suspect desires to waive the presence of counsel") (quoting <u>Alston</u>, 204 N.J. at 624). These cases do not authorize police to reexamine a prior assertion at a future session.

Post-hoc clarification is problematic because the <u>Edwards</u> rule is designed to preclude future dialogue between the suspect and police about the case. Were we to permit, much less require, police to revisit an earlier assertion of the right to counsel when they go back to a detained suspect to ask for consent to search, we would be providing an opportunity and incentive for police to suggest, if only impliedly, that the suspect reconsider his earlier request. That would muddy the bright-line rule announced in <u>Edwards</u>. It might also lead to needless litigation over whether the arrestee rather than police had "reinitiated" a discussion about the case. See <u>id.</u> at 156-58 (compiling cases discussing whether the defendant reinitiated discussions with police).

Given these risks, we are not prepared to extend the clarification principle recently explained in <u>Gonzalez</u> and <u>Alston</u> beyond its original

47 <span>A-3406-22</span>

purpose in a manner that might unintentionally contravene the Edwards doctrine.

## VIII.

That brings us back to the third option, which is to embrace a bright-line rule modeled after the one devised in Edwards, prohibiting police from asking a suspect who remains in custody to grant consent to search if the arrestee had previously asserted the right to confer with an attorney. In considering this option, we emphasize that we do not read Edwards to require suppression in this case. Miranda and Edwards specifically safeguard the right against self-incrimination, focusing on the admissibility of incriminating statements, that is, utterances by an arrestee that are testimonial in nature. The Edwards rule—like the Miranda rule that it reinforces—was not designed to effectuate Fourth Amendment rights and does not address the admissibility of physical evidence seized during a search. See Patane, 542 U.S. at 636 (noting that "the Miranda rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause. The Self-Incrimination Clause, however, is not implicated by the admission into evidence of the physical fruit of a voluntary statement."). That does not mean, however, that the prophylactic function served by the Edwards per se rule cannot and should not be adapted to protect an arrestee's Fourth Amendment/Article I, Paragraph 7 rights. Our analysis

48

thus focuses on whether the <u>Edwards</u> rule should be used as a foundation upon which to augment the protections afforded to persons in police custody when they are asked to cooperate with police by consenting to a search after telling police they want to consult with an attorney.

Such a bright-line rule would provide clear guidance to police and would not require them to speculate on how much weight a reviewing court might assign to the request to speak with an attorney in applying a totality-of-the-circumstances analysis. Furthermore, a prophylactic rule mitigates the risk that the consent search process would open the door to a dialogue about the ongoing investigation in contravention of <u>Edwards</u>.

Here, Aumendo testified that when he went back to defendant to ask for consent to search, he told him the search was to secure firearms "for safekeeping." Aumendo also attested that he did not "question [defendant] any further on this present investigation," and did not converse with defendant about the assault charges, endangering charges, or the two belts that had been recovered from defendant's home during the first consent search.

The trial court found Aumendo was credible, and we accept that finding. <u>See</u> <u>Nyema</u>, 249 N.J. at 526. But the Consent form defendant read and signed explicitly referred to the ongoing criminal investigation, even if Aumendo did not mean to broach the subject. Specifically, the Consent form explained that

49

it authorized police "to seize any item(s) which, in their opinion, <u>may be of evidential value to their investigation</u>."  (Emphasis added).  Aside from thus expressly linking the consent request to the ongoing criminal investigation, the Consent form also contradicted any representation by Aumendo that the search was only to secure firearms "for safekeeping" and not to seize evidence for use against defendant in a prosecution.  The present facts underscore the risk that any post-invocation conversation regarding the investigation might prompt an arrestee to reconsider their earlier decision to ask to confer with an attorney before speaking with police.

Most importantly, we are convinced a prophylactic rule foreclosing a post-invocation consent search request is consistent with the "high preferred place" New Jersey reserves for an attorney's role in "safeguard[ing] [] the exercise of many other valued rights."  <u>Rivas</u>, 251 N.J. at 136.  As Justice Stein pointedly noted in his concurring opinion in <u>Reed</u>, "any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances."  <u>Reed</u>, 133 N.J. at 273 (Stein, J., concurring) (quoting <u>Watts v. Indiana</u>, 338 U.S. 49, 59 (1949) (Jackson, J., concurring)).  We presume that an attorney would likewise be reticent to advise a client to grant consent without first exercising due diligence to determine whether police might find inculpatory evidence or contraband that they would not

50

otherwise gain access to. A search of a home, for example, might lead to the seizure of evidence found unexpectedly under the Plain View doctrine. Cf. State v. Gonzales, 227 N.J. 77, 82 (2016) (eliminating the "inadvertence" element of the Plain View exception under Article 1, Paragraph 7). There is also a risk that police looking to secure lawfully possessed firearms might discover prohibited firearms-related items, such as hollow-point ammunition or, as happened in this case, a firearm that falls within the classification of prohibited assault weapons, and large capacity ammunition magazines.

The point is that granting consent to search one's home entails a calculated risk, balancing the perceived benefits of appearing to be cooperative with police against the chance the arrestee will come to regret that decision if inculpatory evidence is found.[13] While giving legal advice to a client on whether to grant a consent search may not be as impactful, or certain, as advice on whether to submit to custodial interrogation, see Reed, 133 N.J. at 273 (Stein, J., concurring), we believe attorneys, when asked, can help their clients calculate the risks and benefits of providing any form of cooperation to police who are conducting a criminal investigation. Further, an attorney might

---

[13] We appreciate that our perspective is colored by a self-selection bias. We only hear consent-search cases where incriminating evidence was found and the defendant (or the State) is challenging the trial court's ruling on the admissibility of that evidence.

protect the legal interests of a client by minimizing the risks associated with a consent search, for example, by narrowing the scope and physical boundaries of the consent, see note 12, or by arranging with the prosecutor to have the attorney turn over specified items, making it unnecessary for police to enter and physically search the client's residence to look for evidence

## IX.

After considering the benefits and disadvantages of the available options, we choose the one that, in our view, best honors and safeguards an arrestee's assertion of the right to confer with counsel. This approach will not radically change or disrupt police procedures. We suspect the issue before us is novel in part because police and prosecutors in this State know intuitively that they should not reinitiate a conversation pertaining to any aspect of the ongoing investigation once the arrestee has asked to confer with counsel. Nor do we do believe the prophylactic rule we adopt will impose unreasonable burdens on law enforcement or prevent police from securing incriminating evidence by other lawful means. While requesting consent from a person in police custody may be faster and less burdensome than applying for a search warrant, police retain that option for gathering evidence from a suspect's home. See Reed, 133 N.J. at 265.

In sum, we conclude that police were precluded from asking defendant to grant consent to search while he remained in their custody following his unambiguous assertion of the right to confer with an attorney during the Miranda waiver colloquy. Because we adopt a per se rule modeled after the one devised in Edwards, it does not matter that defendant did not re-assert a request to confer with counsel when he was asked to give consent to search his home. The violation of defendant's Article I, Paragraph 7 rights, as effectuated by the coexisting right to the assistance of counsel, occurred when the detective re-initiated a dialogue with defendant pertaining to the ongoing investigation. We hold the consent defendant gave was thus presumptively involuntary as a matter of law. Cf. Rivas, 251 N.J. at 155 (noting that "[w]hen law enforcement officers violate the dictates of Edwards, suppression is mandated of even 'trustworthy and highly probative evidence,' such as a 'confession [that] might be voluntary under traditional Fifth Amendment analysis'") (quoting Arizona v. Roberson, 486 U.S. 675, 681-82 (1988)).

## X.

That conclusion does not complete our analysis of whether the trial court erred in denying defendant's suppression motion. The trial court also found that the firearm and ammunition magazine would inevitably have been

53

discovered. After reviewing the record in light of the governing legal principles, we agree.

The inevitable discovery exception to the exclusionary rule is a species of harmless constitutional error. The doctrine generally permits admission of evidence resulting from an illegal search where the prosecution can show that it would have discovered the evidence "had no illegality occurred." State v. Sugar (Sugar II), 100 N.J. 214, 238 (1985). The purpose of the inevitable discovery doctrine is to "prevent[ ] the prosecution from being in a better position than if the illegal conduct had not taken place," not to "punish the prosecution by putting it in a worse place." Caronna, 469 N.J. Super. at 500 (alteration in original) (emphasis omitted) (quoting State v. Camey, 239 N.J. 282, 302 (2019)).

To prevail, the State must demonstrate clearly and convincingly that:

> (1) proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means.
>
> [Sugar II, 100 N.J. at 238.]

In this case, with respect to the first element, the trial court found that the TERPO application was a proper, normal, and specific investigatory procedure that would have been pursued in order to protect defendant's daughters. The court stated:

> In the present case, as I said, the detective applied for the TERPO, he consulted with who he had to consult with, the prosecutor, because he felt that the defendant did pose a danger to the minor victims in the case based on[,] again[,] the investigations which I don't have to go through what the three daughters were alleging, what they were reporting to [the Division of Child Protection and Permanency], very serious allegations. So the normal and proper investigatory procedures were being followed, which the [c]ourt finds very reasonable to fully and safely complete this investigation.

With respect to the second element, the trial court found that the TERPO would have inevitably led the officers to search the home for weapons, and with respect to the third element, it found that discovery of the evidence through the use of the TERPO would have occurred wholly independently of the consent search.

The trial court's findings are amply supported by the record. The Extreme Risk Protection Order Act of 2018, (ERPO), N.J.S.A. 2C:58-20 to -30, sometimes referred to as New Jersey's "red flag law," allows family, household members, and law enforcement officers to apply to a court for an emergency order to remove firearms from a person who poses a danger to self

A-3406-22

or others.  Modeled roughly after New Jersey's domestic violence laws, the Act authorizes both temporary (N.J.S.A. 2C:58-23) and final (N.J.S.A. 2C:58-24) orders.  See Matter of D.L.B., 468 N.J. Super. 397, 401 (App. Div. 2021).

The only reason the police did not pursue a FERPO was because they had already seized the weapons which the daughters had alerted them to.  In these circumstances, the State has proved by clear and convincing evidence that, had police not requested consent to search, or if defendant refused to grant consent, they would have applied for judicial authorization to conduct a lawful nonconsensual search that would have resulted in the discovery of the assault firearm and large capacity ammunition magazines.  To suppress those prohibited weapons here would contravene the principle that police should not be put in a worse place than if they had not asked defendant to grant consent to search.  See Camey, 239 N.J. at 302.

XI.

Turning to defendant's trial error arguments, we first address his contention that the trial court should have instructed the jury regarding a parent's right to use corporal punishment in response to the jury's question concerning the simple assault charges.  The indictment charged defendant with multiple counts of aggravated assault.  At the charge conference conducted pursuant to Rule 1:8-7(b), both parties agreed that the jury should be given the

56

option to consider the lesser-included offense of simple assault. The trial court instructed the jury as agreed to at the charge conference in all respects, and defendant did not object to the final instructions when they were read to the jury.

During its deliberations, the jury came back with a question: "Does corporal punishment fall under the scope of simple assault? Please clarify if even non[-]excessive spanking/beating as [a] way of discipline to your child is simple [assault] if child feels pain?" The trial court conferred with counsel on how to answer the jury's question. Defense counsel requested the court to instruct the jury that "non-excessive spanking and beating as a way of discipline is not simple assault on the theory that corporal punishment is not illegal in New Jersey. That's clear under Title IX. And so if it's not illegal, then it wouldn't amount to simple assault because it's legal conduct."

The State objected to the defense proposal, arguing, "[i]t is up to the jury to decide whether it's non-excessive spanking, and also whether it's a means of discipline and whether it comes under simple assault. So, the State is asking that you merely . . . reread the instruction on simple assault."

Defense counsel responded to the prosecutor's objection, arguing, "[h]ere the issue is excessive spanking, that's been argued throughout the trial, and that is the specific issue the jury raised in their question." Defense counsel

continued, "I'm asking the [c]ourt to read that charge and explain to them however a parent has a right to spank or discipline their child as long as it is not excessive, since I believe that's the correct statement of the law."

The trial court rejected defendant's argument, ruling:

> So again, I think we are going into areas that were not part of the case, and for instance and perhaps, and this is why the [c]ourt is not inclined to get into more than the charge, . . . the word "spank" perhaps means something different to everyone because from what I believe the word means, that is not what I heard any of the testimony stating as spank. This is not a case about the general principles of discipline and spanking.
>
> So . . . that in and of itself is a reason that the [c]ourt is going to stick with the agreed upon jury charges. There had been, during the jury charge conference, no request to get into perhaps a general jury charge about what the law is in the State as to how to properly discipline a child. And . . . so the [c]ourt doesn't see that as something that at this stage of the case certainly the [c]ourt needs to get into.
>
> And by reading the charge, they will have to do what they're instructed to do, which is figure out what the facts were and . . . they have a copy of course of the charge, with that understanding of the facts that they're determining, whether it . . . falls within simple assault or not.

The court proceeded to reread the simple assault instruction it had previously given to the jury.

"Appropriate and proper charges to a jury are essential for a fair trial." State v. Carrero, 229 N.J. 118, 127 (2017) (quoting State v. Daniels, 224 N.J. 168, 180 (2016)). A "trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Green, 86 N.J. 281, 287-88 (1981)).

"The test to be applied [on appeal] . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law." Baum, 224 N.J. at 159 (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)). "[B]ecause correct jury charges are especially critical in guiding deliberations in criminal matters, improper instructions on material issues are presumed to constitute reversible error." State v. Jenkins, 178 N.J. 347, 361 (2004) (citing State v. Jordan, 147 N.J. 409, 421-22 (1997)). Appellate courts apply a harmless error analysis when a defendant has objected to a jury charge. Ibid.; see also R. 2:10-2. "Under that standard, there must be some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." Baum, 224 N.J. at 159 (alterations in original) (internal quotation marks omitted) (quoting State v. Lazo, 209 N.J. 9, 26 (2012)).

A-3406-22

Accordingly, we must first "determine whether the trial court erred." Jenkins, 178 N.J. at 360-61. If so, we must proceed to determine "if the mistake 'was clearly capable of producing an unjust result such that a reasonable doubt is raised as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid. (quoting State v. Brims, 168 N.J. 297, 306 (2001)).

As to the initial determination, appellate courts apply "the rational-basis test . . . to review the trial court's failure to provide a jury instruction when defendant requested it." Carrero, 229 N.J. at 127-28. "The rational-basis test sets a low threshold[,]" and "[i]n deciding whether the rational-basis test has been satisfied, the trial court must view the evidence in the light most favorable to the defendant." Ibid. This standard also applies to requested charges regarding affirmative defenses. State v. A.L.A., 251 N.J. 580, 595 (2022).

In A.L.A., the trial court denied defendant's request to instruct the jury concerning corporal punishment in the context of a simple assault charge even though it provided the N.J.S.A. 2C:3-8[14] affirmative defense instruction for the child endangerment charge. Id. at 582-83. The Supreme Court noted that although "defense counsel did not expressly cite to N.J.S.A. 2C:3-8 . . . [,] the record is clear regarding what defense counsel twice asked for—an explicit statement that reasonable corporal punishment is not prohibited by law." Id. at 595. In those circumstances, the Court determined the rational basis standard was met and further determined that the omission was reversable error. Id. at 596.

The State argues that A.L.A. is distinguishable from the matter before us because here, "the simple assault charge was wholly separate from the child endangerment charge in this matter. Specifically, simple assault was presented

---

[14] N.J.S.A. 2C:3-8(a) provides in pertinent part:

> [t]he use of force upon or toward the person of another is justifiable as permitted by law . . . where the actor has been vested or entrusted with special responsibility for the care, supervision, discipline or safety of another or of others and the force is used for the purpose of and, subject to section 2C:3-9(b), to the extent necessary to further that responsibility, unless:
>
> a. The code or the law defining the offense deals with the specific situation involved; . . .

as a lesser included offense of aggravated assault, not child endangerment as was the case in A.L.A." We are unpersuaded by the State's argument. The A.L.A. Court noted that there, the child endangerment and assault charges were "packaged together and based on the same alleged conduct," leading it to conclude that "a common sense understanding of the law regarding corporal punishment by a parent or guardian should have resulted in an instruction to the jury, embedded within the simple assault charge, that explained reasonable corporal punishment is not a crime." Id. at 598.

Our review of the record shows that here too, the endangerment charges were based, at least in part, on the conduct constituting the alleged assaults. Specifically, defendant was charged in the indictment with three counts of endangering the welfare of a minor—one count pertaining to each of his daughters. The child endangerment counts alleged specific conduct constituting child abuse or neglect, including that defendant struck the children multiple times with a belt. That was the same alleged conduct constituting all but one of the aggravated assault charges specified in the indictment.[15]

---

[15] For counts one, two, eight, nine, ten, fifteen, and sixteen, the alleged conduct included, among other things, striking Anne, Beth, and Cathy with a belt. For count three, the alleged conduct was "knocking [Beth] to the ground and choking [Beth] by placing both hands around [Beth]'s neck."

62

But even if we accepted the State's argument that <u>A.L.A.</u> is distinguishable, the law is clear that "[w]hen a jury requests clarification, the trial judge is obligated to clear the confusion." <u>State v. Conway</u>, 193 N.J. Super. 133, 157 (App. Div. 1984) (citing <u>United States v. McCall</u>, 592 F.2d 1066, 1068 (9th Cir. 1979)). In <u>State v. Parsons</u>, we noted that, "[j]ury questions present a glimpse into a jury's deliberative process." 270 N.J. Super. 213, 224 (App. Div. 1994). We explained:

> A question from a jury during its deliberations means that one or more jurors need help and that the matter is of sufficient importance that the jury is unable to continue its deliberations until the judge furnishes that help. An appropriate judicial response requires the judge to read the question with care to determine precisely what help is needed.
>
> [<u>Id.</u> at 221.]

We do not believe the trial court "cleared the confusion" expressed by the jury by merely rereading the simple assault instruction that had previously been given to them—the very instruction that prompted their question. Here, the jury asked a direct question on the law and the trial court was obligated to provide a direct answer. We therefore conclude the court erred in its response to the jury question with respect to simple assault. We are not convinced, moreover, that error was harmless beyond a reasonable doubt. <u>See</u> <u>Baum</u>, 224 N.J. at 159; <u>Jenkins</u>, 178 N.J. at 361. We therefore are constrained to reverse

63

defendant's simple assault convictions and remand for a new trial on those counts (counts ten and sixteen).

## XII.

Finally, we address defendant's contention, raised for the first time on appeal, that the trial court erred in instructing the jury on the endangering the welfare of a minor charges. Defendant argues the jury instructions included extraneous language that went beyond the scope of the specific allegations against defendant. Defendant contends that while the indictment specified the alleged conduct constituting child abuse or neglect, such as hitting the children with a belt and choking and threatening them, the court's instruction on the endangerment offense referred to other circumstances, including "habitually tormenting, vexing[,]" "created or allowed to be created a substantial or ongoing risk of physical injury to such child . . . by other than accidental means[,]" and "failure . . . to exercise a minimum degree of care in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment or by any other acts of a similarly serious nature requiring the aid of the court." We emphasize the trial court tracked the model jury instruction for child endangerment. Defendant at the

A-3406-22

charge conference did not ask the court to revise or redact language in the model instruction. Nor did defendant object to the charge as read to the jury.

Our Supreme Court has commented that model jury charges are often helpful to trial judges in performing the important function of instructing a jury. State v. Concepcion, 111 N.J. 373, 379 (1988). A jury charge is presumed to be proper when it tracks the model jury charge verbatim because the process to adopt model jury charges is "comprehensive and thorough." State v. R.B., 183 N.J. 308, 325 (2005). Although following a model jury charge is an important consideration in appellate review, we acknowledge it is not dispositive of whether the charge was appropriate. Cf. State v. Whitaker, 402 N.J. Super. 495, 513-14 (App. Div. 2008) (quoting State v. Angoy, 329 N.J. Super. 79 (App. Div. 2000)) (explaining that "[w]hen a jury instruction follows the model jury charge, although not determinative, 'it is a persuasive argument in favor of the charge as delivered'") (emphasis added).

As the Supreme Court in Concepcion recognized, "[a]n instruction that is appropriate in one case may not be sufficient for another case. Ordinarily, the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case." 111 N.J. at 379. "That requirement [to mold the instruction] has been imposed in various contexts in which the statement of relevant law, when divorced from the facts,

was potentially confusing or misleading to the jury." State v. Robinson, 165 N.J. 32, 42 (2000).

Here, the trial court instructed the jury on the "cruelty to a child" definition from Title 9, as incorporate by reference in N.J.S.A. 2C:24-4(a)(2).[16] We think the "better practice," see Concepcion, 111 N.J. at 379, would have been to redact the references to types of endangering conduct that were not specifically alleged and proved in this case. But in the absence of either a request to make that revision to the model jury charge or an objection to the charge as given, we hold the trial court did not commit error in instructing the

---

[16] In relevant part, N.J.S.A. 9:6-8.21(c) reads:

> "Abused or neglected child" means a child less than 18 years of age whose parent . . . (2) creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause [harm]; . . . (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court; . . .
>
> [(Emphasis added).]

A-3406-22

jury on the child endangerment counts, much less plain error. See State v. Mantalovo, 229 N.J. 300, 320 (2017) (quoting State v. Singleton, 211 N.J. 157, 182 (2012)) (holding that where a defendant does not object to the charge, "there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case").

In State v. Burns, the Supreme Court re-affirmed that:

> In the context of a jury charge, plain error requires demonstration of "[l]egal impropriety of the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."
>
> [192 N.J. 312, 341 (2007) (alteration in original) (quoting Jordan, 147 N.J. at 422).]

We add that "[p]ortions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect." Jordan, 147 N.J. at 422 (quoting State v. Wilbely, 63 N.J. 420, 422 (1973)). The effect must be considered, moreover, "in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

Applying these well-settled principles, we are satisfied the jury instructions on child endangerment were not "clearly capable of producing an unjust result." R. 2:10-2; State v. Torres, 183 N.J. 554, 564 (2005).

Defendant's related contention that the model jury instructions "are so vague as to be unconstitutional" lacks sufficient merit to warrant discussion. <u>See</u> <u>R.</u> 2:11-3(e)(2).

Affirmed in part and reversed in part. We vacate the convictions for simple assault and the sentences imposed on those convictions and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division